**UNITED STATES of America, Appellee,**

v.

**Charles GERSH, Anthony Mugnola and Peter Yuastella, Defendants-Appellants.**

**No. 293, Docket 28332.**

United States Court of Appeals Second Circuit.

Argued Jan. 22, 1964.

Decided Feb. 17, 1964.

Jerome Lewis, Brooklyn, N. Y., for appellants Mugnola and Yuastella.

Joseph Brill, New York City, for appellant Gersh.

Martin R. Pollner, Asst. U. S. Atty. (Joseph H. Hoey, U. S. Atty., Eastern District of New York), for appellee.

Before FRIENDLY and HAYS, Circuit Judges, and ANDERSON, District Judge.[*]

FRIENDLY, Circuit Judge:

After a jury trial before Judge Bartels in the Eastern District of New York, appellants Gersh, Mugnola and Yuastella were convicted on a count charging that they knowingly and with intent to defraud kept counterfeit money in their possession in violation of 18 U.S.C. § 472 and on another count charging that they conspired to commit that crime in violation of 18 U.S.C. § 371.

The evidence showed that Gersh, the first of the three to become involved, along with his partner Russo, was approached by Ralph De Santis to procure purchasers for counterfeit bills. Gersh shortly told De Santis he had found a prospective buyer. A meeting was arranged at the boatyard of one Pokras, who, having previously been offered counterfeit for sale by De Santis, secretly advised the authorities of what was afoot. Gersh came to the boatyard with Mugnola and Yuastella and Michael Kane who was also convicted and is now a fugitive.

Gersh reported that Mugnola and Yuastella, friends of his friend Kane, wanted to buy counterfeit and that Kane's cut would come out of Gersh's share. Kane announced in the presence of Mugnola, Yuastella, Gersh and De Santis that his friends were "ready to buy the money now," and Yuastella showed De Santis a shoebox purportedly containing $20,000 with which he wanted to do business that night. Not yet having procured the merchandise, De Santis could not comply, but he agreed to pick up Mugnola and Yuastella at the boatyard the next evening and to sell them $100,000 in counterfeit for $16,000 cash. The next morning De Santis instructed Pokras to reserve a room at a motel wherein to consummate the bargain. Pokras reserved two rooms, leaving one key for the Secret Service who hid personnel there. At a bar De Santis then purchased $100,000 in counterfeit for $13,000 on credit and drove off with Pokras to the motel. On seeing what he took to be a police car, he insisted on going to a different motel where he and Pokras counted and examined the counterfeit. There were fifty piles, each containing approximately one hundred twenty-dollar bills. Pokras and De Santis testified that the bills bore the same serial number, that they had a peculiar odor and that they left ink stains on the hands when crumpled. At the appointed hour, the two returned to the boatyard, picked up Mugnola and Yuastella and drove them to the motel. After some preliminary bickering over safeguards and procedure, all four went to the room, where the counterfeit was reposing in a drawer. Matters then took what for De Santis and Pokras was an unexpected turn. Producing revolvers, Mugnola and Yuastella forced them into the bathroom and commanded them to wait there for twenty minutes. When they emerged, Mugnola and Yuastella were gone and so, of course, was the counterfeit. De Santis later complained to Gersh that he would hold him responsible for the contretemps, but such efforts as Gersh and Kane made to find the absconders proved

* Sitting by designation.

**462**

unavailing. The record contains much more, but the foregoing summary is sufficient.

 Most of appellants' points require little or no discussion. The claim that Mugnola and Yuastella could not have conspired with De Santis et al. since the former intended to steal and the latter to sell verges on the ludicrous. The statute forbids possession of counterfeit with intent to defraud; the evidence amply warranted the jury in finding that appellants agreed to bring the counterfeit first into De Santis' possession and later into Mugnola's and Yuastella's. There was no less a meeting of the minds on this because, whether initially or later, Mugnola and Yuastella determined to deceive the deceiver. The Government's failure to produce the counterfeit, which admittedly is no bar to the conviction on the conspiracy charge, United States v. Agueci, 310 F.2d 817, 828 (2 Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963), is likewise no bar as to the substantive count in the light of the Government's inability to find the counterfeit and the substantial evidence offered in regard to it, United States v. Agueci, supra, 310 F.2d at 828; Lisansky v. United States, 31 F.2d 846, 850, 67 A.L.R. 67 (4 Cir.), cert. denied, 279 U.S. 873, 49 S.Ct. 514, 73 L.Ed. 1008 (1929); McDonald v. United States, 89 F.2d 128, 136–137 (8 Cir.), cert. denied, 301 U.S. 697, 57 S.Ct. 925, 81 L.Ed. 1352 (1937). Complaint is made that, in giving the usual cautionary charge, the judge referred to De Santis as an accomplice; this, it is said, prejudiced appellants by indicating a belief by the judge that De Santis had joined them in wrongdoing. The Government responds that Judge Bartels began this portion of the charge by characterizing De Santis as "a confessed accomplice" which he surely was, and that the jury must have understood the instruction to relate to the testimony of a person who had cast himself in that role. We are clear that the instruction sufficiently met the demands of nicety and could not have been considered by the jury as indicating any prejudgment by the court.

One matter requires more extended discussion. The jury, having deliberated since lunchtime, rendered its verdict at 10:45 P.M. on October 22, 1962, and was excused fifteen minutes later. After various motions had been made and decision on them reserved, the Government asked that the defendants be remanded in custody, which defense counsel naturally opposed. The following colloquy ensued:

"The Court: Well, I will tell you what bothers me here, Mr. Lewis, and I want all the defendants to hear that because I don't know just who is responsible, and that is this:

"Someone has made some phone calls, anonymous phone calls, to the witness Pokras; and someone has made some anonymous phone calls to the forelady of this jury—she reported them to me this morning—all yesterday without waiting for anyone to pick up the receiver and simply stopping as soon as the receiver was picked up, but then renewing the call every hour, beginning also this morning at 6:30.

"She had never received such calls before until she served on this jury, and of course there have been some phone calls to Pokras.

"Now, you know, Mr. Lewis, I would not stand for anything like that. If I ever found out who is responsible for that sort of thing, you know what I would do, don't you?

"Mr. Lewis: You would be entirely justified.

"The Court: But, of course, we have no one to pinpoint and consequently I have to be fair and open-minded about it.

"Mr. Lewis: I can't conceive—

"The Court: But to whom it may concern, and I shall just issue a warning, that if I discover that anyone involved in this case is responsible directly or indirectly for such phone calls, I assure you that I would

not hesitate to immediately see that he is remanded in custody.

"Mr. Lewis: Judge, I cannot conceive of any defendant being stupid enough to do it because he would be certainly convicted.

"The Court: Well, I kept it out of the case, gentlemen, but of course we cannot assume that these defendants did it either if we are going to follow our own principle that a man [is] presumed innocent until proven guilty, but it is a coincidence which I ought to mention in passing."

On November 30, when the defendants appeared before the court for sentence, counsel moved for a new trial on the ground "that there should have been a *voir dire* conducted of the forelady before the case went to the jury to find out whether or not she was prejudiced against the defendants." The judge then gave this further elucidation:

"Here is the way it happened: She sent in a note to the effect that her husband was ill and she wanted someone to call up her husband to see how he was; and whether or not the phone calls that had been the preceding day or that night—I forget which—were continuing; and I had the bailiff or my law clerk—I don't know which—make the call to her husband. * * * [A] note was sent in that her husband was all right. The phone calls had not continued."

He added that the forelady had not suggested that she connected this disturbance with the defendants and that, in the message he had sent back, she "was definitely instructed not to mention this to any other juror." Counsel then renewed the motion for a new trial; the judge denied it.

The record does not leave it altogether clear whether the communication from the forelady was received before the jury began its deliberations, as would appear from the judge's statement on the evening of October 22 that she had reported the telephone call "this morning," or during the deliberations, as seems to have been assumed at the argument on November 30. If the former was the case, the judge should have advised counsel immediately on receiving the report; on a suitable request he should then have examined the forelady and possibly other jurors as well. On the other hand, if the forelady's report came to his attention only during the jury's deliberations, we can see the wisdom of his not interrupting these, although it would have been better to have advised counsel then and there. In any event, hindsight now makes it plain that it would have been well for the judge to have held the jurors after the verdict so that they would be available if counsel, on learning of the incident, wished a hearing.

■ The Government contends that the matter is too trifling to warrant action on our part since there is no evidence that the forelady attributed the calls to any of the defendants, and furthermore that defendants waived the point by failing to seek action on the night of the verdict. The latter argument would indeed be persuasive if defense counsel had known of the incident before the case was submitted to the jury or while it was deliberating, but had nevertheless stood mute, gambling on an acquittal while holding this issue in reserve. Cf. United States v. Agueci, 310 F.2d 817, 836–838 (2 Cir. 1962). But that was not the fact. Counsel were told of the incident after the verdict and then only as it bore on the defendants' remand. This could well have diverted their attention from its possible significance as to the verdict, and we are not disposed to hold them to a very high standard of acuteness at midnight after a long day in court. Moreover, the jury had already been excused, and there is nothing to show that the forelady and, if necessary, other jurors could not have been examined on November 30 nearly as well as on October 23.

■■ What we do find compelling in the Government's favor is that defense counsel did not ask for such an examination even then. The five and a half weeks'

interval between October 22 and November 30 afforded ample opportunity to determine the appropriate remedy. Save when the conceded facts as to outside contact with a juror conclusively show prejudice, the court is not bound to order a new trial but rather to conduct a hearing in which the facts can be established, with the Government having the burden of showing that any such contact "was harmless to the defendant." Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956); Wheaton v. United States, 133 F.2d 522 (8 Cir. 1943). If a request for such a hearing had been made, it should have been granted. But defense counsel never made such a request; their motion on November 30 was not for a hearing, which, so far as appears, would still have been entirely practicable and which the judge might well have directed had he been asked. Instead they sought a new trial because of his previous failure to hold a hearing, an error which counsel chose to regard as beyond correction. Although a hearing still has not been requested, we have considered whether, under our power to "require such further proceedings to be had as may be just under the circumstances," 28 U.S.C. § 2106, we ought nevertheless to direct one, as was done in the Remmer and Wheaton cases, supra. We have concluded not to do so. Appellants have never come forward, as did the defendants in the Wheaton case, with affidavits of the forelady or of other jurors that would raise an issue of prejudice by showing that the forelady attributed the annoying calls to them. Something more than the mere fact of an unknown and here uncompleted contact with a juror is needed to call for vacating a judgment of conviction to permit a hearing which the appellants have not sought. See United States v. Kahaner, 317 F.2d 459, 482–483 (2 Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963); Mee v. United States, 316 F.2d 467, 468–469 (8 Cir. 1963).

Affirmed.