James MILLER, Appellant,

v.

UNITED STATES of America, Appellee.

No. 76, Docket 32368.

United States Court of Appeals Second Circuit.

Argued Sept. 19, 1968.

Decided Oct. 9, 1968.

Steven B. Duke, New Haven, Conn. (W. Paul Flynn of Kopkind & Flynn, New Haven, Conn. and Richard H. Simons, Milford, Conn., on brief), for appellant.

Jon O. Newman, U. S. Atty., District of Connecticut, Hartford, Conn., for appellee.

New York County Lawyers' Assn. (Nathan B. Kogan, George S. Leisure, Jr., David Hartfield, Jr., Edward J. Daus, New York City, of counsel), filed brief as amicus curiae.

Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal is from an order of Judge Blumenfeld in the District Court for Connecticut enjoining defendant Miller, whose conviction we have affirmed, 381 F.2d 529 (1967), cert. denied, 392 U.S. 929, 88 S.Ct. 2273, 20 L.Ed.2d 1387 (1968), his counsel, an investigator counsel had employed, and other agents "from making any inquiry of any of the jurors who comprised the petit jury which heard and decided the above cap-

tioned case, except upon further order of the court."

I.

No one has challenged our jurisdiction to entertain the appeal, the parties apparently having assumed that this was conferred by 28 U.S.C. § 1292 (a) (1). However, we are bound to consider the question, and we think it plain that the answer must be in the negative.

We have held in civil cases that § 1292(a) (1) is limited "to injunctions which give or aid in giving some or all of the substantive relief sought by a complaint" and does not include "restraints or directions in orders concerning the conduct of the parties or their counsel, unrelated to the substantive issues in the action, while awaiting trial." International Prods. Corp. v. Koons, 325 F.2d 403, 406 (2 Cir. 1963), and many authorities there cited. The same principle must apply in criminal cases; indeed we had earlier held in such a case that "an order, made in the exercise of 'the inherent disciplinary power' of the court, directing one of its own officers to refrain from using books and papers claimed to have been unlawfully taken until the court can determine his right to use them" was not an injunction within § 1292(a) (1). Grant v. United States, 282 F.2d 165, 169 (2 Cir. 1960). Indeed, we strongly doubt whether § 1292(a) (1) applies to criminal cases at all. That section, as it appeared in the Evarts Act of 1891, c. 517, § 7, 26 Stat. 828, and later in the Judicial Code of 1911, c. 231, § 129, 36 Stat. 1134, began "where, upon a hearing in equity in a district court," language manifestly inapplicable to criminal cases. The Supreme Court has said that the dropping of the words "in equity" by the amendment of 1925, 43 Stat. 937, was not intended to effect a change, Schoenamsgruber v. Hamburg American Line, 294 U.S. 454, 457 n. 3, 55 S.Ct. 475, 79 L.Ed. 989 (1935); Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 180 and n. 6, 75 S.Ct. 249, 99 L.Ed. 233 (1955), and the latter decision necessarily im-

plies the same about the revision of 1948. Most decisive of all is the Court's statement that "every statutory exception" to the final judgment rule "is addressed either in terms or by necessary operation solely to civil actions," emphasizing that "the delays and disruptions attendant upon intermediate appeal are especially inimical to the effective and fair administration of the criminal law." Di Bella v. United States, 369 U.S. 121, 126, 82 S.Ct. 654, 658, 7 L.Ed. 2d 614 (1962). See In re Grand Jury Investigation, 318 F.2d 533, 536 (2 Cir.), petition for certiorari dismissed, 375 U.S. 802, 84 S.Ct. 25, 11 L.Ed.2d 37 (1963). The importance of expedition in criminal cases is as great when a convicted defendant remains at liberty—here more than two years after conviction—as before trial.[1]

We are free, however, to consider the appeal as a petition for mandamus or prohibition, see International Prods. Corp. v. Koons, supra, 325 F.2d at 407, although notice would have to be given the judge before any writ were to issue. We deem this an appropriate instance for doing so. Miller's challenge to the power of the district court to enjoin inquiry of the jurors falls within the traditional ambit of the extraordinary writs. Since this case of first impression is properly before us on that basis, we may deal also with Miller's challenges to the propriety of the order "so as to avoid piecemeal litigation and to settle new and important problems." Schlagenhauf v. Holder, 379 U.S. 104, 109–112, 85 S.Ct. 234, 239, 13 L.Ed.2d 152 (1964). See D. Currie, Federal Courts 234–35 (1968).

## II.

The activities of defense counsel that triggered the injunction stemmed from the remark made by an outsider to one of the jurors, which was discussed in Part VI of our earlier opinion, United States v. Miller, 381 F.2d 529, 538–540 (1967), cert. denied, 392 U.S. 929, 88 S.Ct. 2273, 20 L.Ed.2d 1387 (1968). As there recounted, the juror related the incident to the deputy clerk, who in turn informed the judge. The latter immediately brought the matter to the attention of counsel, saying that, although he was not quoting exactly, "a juror was informed or told at a social family affair —some dinner party, I guess—that there were toughs or hoodlums in the Torrington area, where this juror lives, who * * * were stating that they had better vote—the jurors had better vote in favor of Jimmy Miller, or watch out."[2] The judge announced his intention to pursue the matter, and said "I don't think that counsel ought to be present when I discuss this with the jurors." Leading defense counsel at the trial, Percy Foreman of Houston, Texas, agreed, and the Judge invited suggestions about the course he should follow; apparently his then intention was to have each of the twelve jurors brought to him. Mr. Foreman proffered the suggestion that since the trial would shortly be over, such interviews with jurors should be postponed until the taking of evidence was concluded. He asked also for "the full information" after the verdict was in, since "we want to conduct our investigation of this sort of thing outside of police fraternities as to what brought

1. We see no basis for upholding appealability under the "collateral order" doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Even if that case had gone so far as to rule that an appeal can be taken from any order that cannot be effectively reviewed on appeal from a final decision, which it did not, see Donlon Industries, Inc. v. Forte, 402 F.2d 935 (2 Cir. 1968), such a principle would not sustain jurisdiction here, since the propriety of the order now challenged could be attacked on re-

view of a decision denying a new trial on the basis of what the investigation had already produced.

2. The clerk's version was, "Unless they found it Jimmy Miller's way they'd better be careful." Since both versions somewhat outran the juror's later statement, we find it difficult to understand counsel's claim that "the substance and prejudicial nature of the communications was not revealed" until four months after the trial.

about this situation"; he was particularly concerned with finding out who had talked to the juror.[3] The judge did not then commit himself on what he would disclose. After further discussion it was left that the judge should call in the juror and simply caution him not to repeat the story to other jurors, with further inquiry by the judge to be deferred as Mr. Foreman had proposed. The judge did this and, on learning that the juror, Leslie Lester, had told two other jurors from Litchfield, Clarence Baldwin and Levi Parsons, asked him to transmit the same caution to them.

After the evidence had been completed, the judge called the three jurors into his chambers; our opinion, 381 F.2d at 539, which we quote in the margin,[4] summarizes what occurred.

On the next day, June 2, 1966, the case was submitted to the jury, which returned a verdict of guilty. On September 26, the day of sentence, one of the defense counsel, Mr. Flynn, was to argue a motion for a new trial based in part upon the communication to juror Lester. Before argument the judge made available the transcript of his conference with the jurors. Mr. Flynn sought an adjournment to afford an opportunity "to do some further investigation." He stated that the three jurors had agreed "to be interviewed by people who were engaged by the defense to conduct the independent investigation"; that the jurors had then consulted an attorney; and that he was then advised that the matter should be "held in abeyance until an affirmative order of Judge Blumenfeld is issued." The judge heard the motion for a new trial on its merits and denied it, saying that "to permit and indulge in post-verdict inquiries of each and every juror as to the reasons why he reached a verdict * * * has been invariably discountenanced by the Court."

More than a year later, in November 1967, Mr. Duke, another of Miller's attorneys, took up the matter again.[5] As stated in his brief, he requested the Diamond Detective Agency of Boston to "provide an investigator to conduct interviews of the jurors, alternates, and others regarding the warning which had been given to Mr. Lester." No request for permission to conduct such interviews was made to the judge; indeed neither he nor the United States Attorney was informed. The investigator, Miss Virginia Samon, "an attractive, petite blonde, twenty-two years old," received her initial instructions from still another defense attorney, Mr. Simons. As she testified at the hearing below, she was to ask all the jurors "whether any or all of the jurors had been influenced in any way by the threats which

3. The clerk said the man was "a friend that he has known a long time." The juror confirmed this when subsequently interviewed by the judge.

4. "The juror reported that a man serving drinks at a cocktail party had said, 'I'm just going to warn you that another man in Litchfield told me that when this is over, that unless you're very careful that there is a bunch in Torrington who are going to get after you and beat you up. They don't want to kill you, but they don't like what is going on.' After pointing out that such a remark might have been intended either to intimidate a juror or to cause him to stiffen up, the judge inquired whether it would affect the decision of any of the three. All answered in the negative and assured the judge that no other jurors knew of the incident.

The juror to whom the remark had been made then said he thought one of the others 'should mention something about that place over there.' This juror said there were two places in Torrington where his grandsons reported dope was being sold. He added 'that doesn't affect me any, only to the extent I have grandsons, and so forth,' the suggestion apparently being that the judge should bring the matter to the attention of the authorities in order to stop further sales. On further questioning this juror affirmed, 'It has nothing to do with me. I will say it the way I see it.' On returning to court the judge denied a defense motion for a mistrial."

5. This court had affirmed the conviction on July 26, 1967, and denied rehearing on September 26, 1967.

were imposed upon three of the jurors,[6] and he [Mr. Simons] set up two questions involving this, first, were they aware of the threats, and if so, the second question was what effect did they have, if any, influence on them whatsoever." She later saw Mr. Duke, who "went along" with this. He made no effort to have Miss Samon ascertain who spoke to Lester, although he had tried by other means without success.

On her first day Miss Samon interviewed five jurors in unannounced visits at their homes. Later she had further discussions with Mr. Duke, who furnished her with two questionnaires, one designed for the three jurors and one for the others.[7] All told, she interviewed or sought to interview eight or nine jurors. Admittedly the conversations "were very long and involved," but on Miss Samon's version, this was "only because they in turn asked me many questions." Miss Samon was not altogether unresponsive to such inquiries; concluding a conversation with a lady juror, she asked "at what point during the progress of the case she determined that Mr. Miller was guilty." Several jurors, including Parsons, declined to be interviewed. Miss Samon paid two visits to Lester, Baldwin and Parsons although Baldwin and Parsons had said on her first visit that they did not wish to discuss the case. Her affidavit summarizing the interviews indicates that she did not discover any communications to the

jurors other than the one known during the trial or any difference in the tenor of that one; in fact it is silent about interviews with jurors other than the three whom the judge had questioned. The only new facts or occurrences outside the jury room were that at least one of the jurors had sought police protection during the trial[8] and that an unnamed juror at an unidentified time kept a shotgun with him while shingling his roof. However, the affidavit contains additional material concerning the extent of the jurors' knowledge of the threat and Lester's and Baldwin's assessment of its effect.

III.

The New York County Lawyers' Association as *amicus curiae* and, to a lesser degree, the parties urge us to formulate guidelines to govern the entire subject of post-verdict interrogation of jurors. We respectfully decline the invitation. Such an enterprise, which would involve considering a great variety of situations, would require the kind of collaborative effort by judges, prosecutors, defense lawyers and legal scholars that has produced the American Bar Association's useful series of Standards for Criminal Justice.[9] We shall follow rather the ancient but still honorable practice of deciding the case before us.

 Taking first the issue of power, we see no basis for doubting the authority of the trial judge to direct that any

6. In fact the threat had been made only to one.

7. The questionnaires, with 18 questions for the three jurors and 11 for the others, asked the jurors to describe not only their own mental processes but those of others. The three were to be asked whether they had discussed the threat with any of the other jurors, how those jurors had reacted, and whether any of them had appeared to be frightened. The questionnaire for the nine other jurors asked whether they knew what the judge's "secret conference" with Lester, Baldwin and Parsons was about, what explanations Lester, Baldwin and Parsons had given for it, and whether these had satisfied

the other jurors. One juror answered the first of these latter questions "No" and the second "None."

8. According to her affidavit the Connecticut state trooper whom she interviewed named only one; the juror who had received the threat said all three had joined in the request.

9. The Standards Relating to Trial by Jury contain a section, 5.7, entitled "Impeachment of the Verdict," which deals with the substantive grounds for impeachment and the purpose for which a juror's testimony or affidavit may be received but pretermits the procedural question of interviews.

interrogation of jurors after a conviction shall be under his supervision. To determine how far such questioning shall be permitted and in what manner it shall be done requires a weighing of two conflicting desiderata. One is the protection of the defendant's right to a fair trial before "an impartial jury." The other is avoidance of the dangers presented by inquiries that go beyond objective facts: inhibition of jury-room deliberations, harassment of jurors, and increased incidence of jury tampering. Judge Smith observed in United States v. Crosby, 294 F.2d 928, 950 (2 Cir. 1961), cert. denied, Mittleman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962):

"There are many cogent reasons militating against post-verdict inquiry into jurors' motives for decision. The jurors themselves ought not be subjected to harassment; the courts ought not be burdened with large numbers of applications mostly without real merit; the chances and temptations for tampering ought not be increased; verdicts ought not be made so uncertain. Whenever information erroneously reaches the ears of the jury in open court, the judge's instruction to disregard it may be disobeyed; yet it is not suggested that in such a case the jury ought be polled as to whether any of them relied on the forbidden knowledge. Even though presumably the jurors themselves know best, the question is determined, as is the question whether an error was prejudicial, on the basis of the nature of the matter and its probable effect on a hypothetical average jury. The same reasons apply when the improper knowledge reached the jury outside the courtroom. It was not error to refuse to examine the jurors as to their mental processes."

Especially because the line between proper and improper inquiry is not easy to draw, see fn. 11, and because the jurors may be in doubt about the proprieties, the judge may well find it better that he control any questioning, whether by having it done in open court, as the Supreme Court directed in Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), by allowing depositions where the prosecutor would have an opportunity to object to improper questions, or by passing in advance on the questions sought to be propounded.

Appellant's assertion that a defendant must be as free to interrogate jurors after a conviction as he is to interrogate prospective witnesses before trial does not require extended answer. Inquiry of jurors after a verdict seeks to impugn the validity of judicial action on the ground of misconduct of a member of the tribunal. The court has a vital interest in seeing that jurors are not harassed or placed in doubt about what their duty is and that false issues are not created. The argument that interviews by a private investigator involve less harassment than such methods as we have outlined is unconvincing. A juror so interviewed often does not know what he is supposed to do or supposed not to do. Moreover, except when the interview yields nothing, it is only the beginning. In any event such considerations go to the exercise of the power, not to its existence. At least one state, known for the quality of its judicial administration, has adopted a rule that "No attorney shall himself or through any investigator or other person acting for him interview, examine or question any juror with respect to the verdict or deliberations of the jury in any action except on leave of court granted upon good cause shown." N.J.Rev.R. 1:25A. Although the subject is indeed appropriate for court rule, the absence of one does not deprive a judge of power to act in an individual case.

## IV.

Being thus convinced that a trial judge has power to bring post-verdict interrogation of jurors under his control, we find it difficult to conceive a clearer case for its exercise than this one.

We begin with the fact that the episode here was not unknown to the defense at the time of submission to the jury, as in Remmer v. United States, supra, and United States v. Gersh, 328 F.2d 460, 462–464 (2 Cir.), cert. denied, Mugnala v. United States, 377 U.S. 992, 84 S.Ct. 1919, 12 L.Ed.2d 1045 (1964), but, after proper disclosure, had been left for the judge to handle before the case was submitted—with the full consent of highly experienced defense counsel. Later the judge denied defense counsel's request to allow them to make a further investigation before he acted on the motion for a new trial. Under these circumstances courtesy alone, apart from any higher obligation, would have suggested that counsel at least advise the judge before initiating an investigation more than a year later, when the jurors had every right to expect peace.[10] The judge rightly reasserted the control he doubtless thought had always been his.

Even more important, the district court had reason to believe that the investigation was exceeding any proper bounds. The defense chose to have the interviews performed by a private investigator who was not a lawyer despite the obvious importance of insuring that the interviews not overstep lines that only a lawyer could understand and enforce. The instructions to the investigator did not limit her inquiry to what the jurors had heard or done outside the jury room but called for each juror's views about his own and others' mental processes.[11] When we combine Miss

10. Testifying in the District Court, Mr. Duke asserted that he thought an invitation had been extended by a footnote in the United States Attorney's brief in this court on the appeal from the conviction and something said by the latter in oral argument at that time. Since most of the footnote deals with requests that might have been made of the district court, the reliance apparently is on the last sentence:

"In any event, ever since the hearing on September 26, 1966, counsel has been free to pursue the matter and seek to present to the trial court any new facts not previously disclosed by the court's own inquiry."

This is at best ambiguous; moreover, the United States Attorney does not speak for the judge. The United States Attorney is said to have made a similar remark at oral argument and also to have stated "that the Government had conducted an investigation and found nothing apart from cocktail party gossip."

11. The established rule in the federal courts, recognized at least since Mattox v. United States, 146 U.S. 140, 148–149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892), is that "A juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind" and may also "testify in denial or explanation of acts or declarations outside the jury room, where evidence of such acts has been given as ground for a new trial"—the quotations being from an opinion by Mr. Justice Gray in Wood-

ward v. Leavitt, 107 Mass. 453, which the Supreme Court adopted. While this rule can be criticized as forbidding inquiry into the subject most truly pertinent, it represents a pragmatic judgment how best to attempt reconciliation of the irreconcilable. We applied the rule in United States v. Crosby, supra, 294 F.2d at 949–950, and did not mean to depart from it in United States v. Gersh, supra, 328 F.2d at 464. Section 5.7 of the ABA's Standards Relating to Trial by Jury adopts the negative portion of Mattox; it recommends that, with an exception not relevant, "Upon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined," citing inter alia, Uniform Rules of Evidence 41 and ALI Model Code of Evidence, Rule 301. Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror. See 7 Wigmore, Evidence § 2353 (McNaughton rev. 1961), and the excellent discussion by Mr. Justice Brennan in State v. Kociolek, 20 N.J. 92, 98–100, 118 A.2d 812, 815–816, 58 A.L.R.2d 545 (1955).

Defense counsel contends that this long-recognized distinction has been eroded sub silentio by Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956), and Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966).

Samon's lack of legal training, the instructions given her, and the nature of the questionnaires, see fn. 7, it is no wonder that at least some of the interviews became the kind of wide-ranging discussions of what occurred in the secrecy of the jury room that the law has long sought to prevent.[12] In our view the judge would have failed in his duty if he had not taken appropriate measures to prevent further inquiry of jurors save as the court, on a sufficient showing, might permit.

We do not read Judge Blumenfeld's opinion as foreclosing an application for further inquiry. We earnestly suggest that the judge set a date by which this must be done. A time must come, and soon, when all grounds for a new trial in this case, tried more than two years ago, will have been presented and either a new trial will have been granted or the denial can be brought to us for review. If such an application should be made, Judge Blumenfeld will have to determine the likelihood of the defense's being able to develop new evidence admissible under the rules governing impeachment, see fn. 11; if he should find that issue in the defense's favor, he will have to determine what questions may be asked, of whom, where, and how. We intimate nothing about the course he should follow.

We dismiss the appeal for want of jurisdiction. Treating the appeal as an application for mandamus or prohibition, we entertain it but decline to alter the order of the District Court. The mandate shall issue forthwith.

While only the Supreme Court can ultimately decide this, we doubt it. The *Remmer* opinion stressed the inherent effect of the juror's successive encounters with the possible bribe offer and the F. B. I. investigation. In *Parker* the Court observed that the bailiff's statement to the jurors "beyond question carries great weight with a jury which he had been shepherding for eight days and nights." 385 U.S. at 365, 87 S.Ct. at 470. Although the Court considered a statement by one of the jurors that she had been prejudiced, that statement had been elicited and considered by the lower court itself. The Court found reliance on the statement unnecessary because "the unauthorized conduct of the bailiff 'involves such a probability that prejudice will result'" that a new trial was mandatory. Id., quoting Estes v. State of Texas, 381 U.S. 532, 542–543, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).

Our recent experience with threats to jurors near the conclusion of criminal trials, see, in addition to United States v. Gersh, supra, United States v. Borelli, 336 F.2d 376, 392 (2 Cir. 1964), cert. denied, Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), would cause us to view with apprehension any relaxation of the *Mattox* rule that would permit verdicts to be impeached by testimony of jurors about the effect of outside incidents on their mental processes. Where, as here, the incident was explored before submission to the jury, the trial judge's initial appraisal of the ability of the jurors to render a fair verdict in light of the objective facts should stand unless it is manifestly unreasonable, as the Court thought in *Remmer*, or significant new objective facts are developed.

12. The danger that the fruits of such unlimited discussions will be abused finds substantiation in this case. Although the interviews were begun for the purpose of investigating the communication made to juror Lester, counsel learned from loquacious jurors that a rumor had circulated among them about the large fee it was thought the chief defense counsel was receiving. Although there is no evidence that this rumor had been instigated by an extrinsic communication to any of the jurors, its existence is urged by defense counsel in this court as a ground for impeachment of the verdict. A similar airing of every item of jury gossip could do serious harm to the freedom of jury room discussion.