**UNITED STATES of America**

v.

**Rex C. CAUBLE, Individually and doing business as Cauble Enterprises.**

**No. S–81–15–CR.**

United States District Court,
E. D. Texas,
Sherman Division.

Feb. 19, 1982.

Robert Wortham, U. S. Atty., David P. Baugh, Asst. U. S. Atty., Beaumont, Tex., M. Lawrence Wells, Asst. U. S. Atty., Tyler, Tex., and David Smith, Asst. U. S. Atty., Washington, D. C., for the United States.

Roy Q. Minton and Charles R. Burton, Minton, Burton & Fitzgerald, Austin, Tex., Jack Gray, Gray, Whitten & Lovelace, Denton, Tex., and G. Brockett Irwin, Longview, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

STEGER, District Judge.

This Court is asked to determine whether the defendant should be allowed to interview jurors in order to ascertain whether extraneous prejudicial information was improperly brought to the jury's attention.[1] Defendant Rex Cauble has filed two motions requesting permission to interview jurors in order to determine whether any of the jurors were exposed to news media accounts of interviews with two government witnesses, Anita McKesson and Texas Ranger Stuart Dowell.[2] In the alternative, the defendant asks the Court to conduct the

---

1. A ruling on the motion relating to the alleged nondisclosure of information during voir dire examination by two jurors will be reserved until the Court has had an opportunity to review a transcript of the voir dire examination.

2. There is nothing in the record to indicate in what manner the interview attributed to Stuart Dowell was disseminated. According to the defendant's unverified transcript, the following was broadcast.

inquiry. Implicit in the defendant's motion is his contention that the interviews contained extraneous prejudicial information which, if viewed by the jury, would abridge his Sixth Amendment rights to a trial by an impartial jury and to be confronted with

> Damaging testimony about Rex Cauble was given outside this Federal Courthouse. Texas Ranger Stuart Dowell said very little on the witness stand, but outside the courtroom Dowell said Cauble lied to him in 1970 when Dowell was investigating a Cauble employee. Dowell also said that informants have linked Rex Cauble to illegal drug and bribery activities in the past. Outside the courtroom, another witness said Rex Cauble had been investigated by Tarrant County District Attorney Tim Curry. The witness, Anita McKesson, works for Curry and she claims she wanted her husband to stop working for Cauble when she heard about the investigation. Attorneys defending Cauble in this drug smuggling trial were skeptical about the out-of-court remarks.

Dowell was a character witness the government presented on rebuttal. His testimony is as follows:

Q. Would you please state your full name for the Court and for the record?
A. Stewart Dowell.
Q. How do you spell your last name, sir?
A. D, as in David, O–W–E–L–L.
Q. Mr. Dowell, how are you employed?
A. Texas Department of Public Safety.
Q. What position do you hold with them?
A. Texas Ranger.
Q. How long have you been a Ranger?
A. Since 1969.
Q. How long have you been employed with the Texas Department of Public Safety?
A. Since 1957.
Q. What geographic area do you work in?
A. I'm stationed in Tyler, and I work Van Zandt, Smith and Rusk Counties.
Q. Were you ever stationed at any other areas?
A. Yes, sir, I was stationed in Dallas and Victoria before that.
Q. All right. Do you know a Mr. Rex C. Cauble?
A. Yes, sir, I do.
Q. Sir, do you have an opinion as to—Based on your contacts in the community, do you have an opinion as to Mr. Cauble's reputation for being a lawful, truthful and his truth and veracity?
A. Yes, sir, I do.
Q. What is his reputation for truth and veracity?
A. It's bad.
Q. Do you have an opinion, sir, on Mr. Cauble's reputation for being peaceful and law-abiding?
A. Yes, sir, I do.
Q. What is that opinion?
A. It's bad.

Dowell was not cross examined.

The testimony of Anita McKesson is attached to this opinion as an Appendix. The defendant contends that the following is a transcript of the news report including her interview broadcast on Channel 4, KDFW, Dallas:

REPORTER: The Federal Government's drug smuggling case against Rex Cauble goes to the jury tomorrow in Tyler. Tonight Channel 4's Quin Matthews reports both sides have rested after one last attempt to link the Denton millionaire to a marijuana smuggling operation.

QM The damaging testimony came from Anita McKesson. Her husband worked for Rex Cauble as his private pilot. Mrs. McKesson said in Court she told her husband to quit after she said she obtained some information on Cauble. What she didn't tell the jury though was that she works for Tarrant County District Attorney Tim Curry and that in 1977 the D.A.'s office had gotten information that Cauble was a drug smuggler. Outside the Courthouse, she told us her story.

AM I told my husband at the time we were conducting an investigation and the information I had obtained on Rex Cauble I couldn't tell my husband about at that time, but I told him that I was terrified for him to continue flying for him and I feared for our safety if, if he continued to do so, and that he should quit.

QM How did your husband feel?
AM He felt the same way.
QM What made him feel that way?
AM Ah, because he knew what was going on.
QM What was going on?
AM Ah, that there was, he was involved flying for a dope smuggling ring is what he felt he was doing.
QM Did your husband feel that Rex Cauble knew about it and organized it or condoned it?
AM He felt that Rex Cauble knew about it, yes.
QM Did he feel like Rex Cauble was behind it?
AM Yes, I believe he did.

.     .     .     .     .

QM Cauble seemed disturbed by the testimony. He was asked if he was surprised.
CAUBLE Quite surprised.
REPORTER: Defense attorneys expressed concern about the nature of the interview and its potential effect on the trial, so the jury has been instructed again not to watch tv or read newspapers before the trial of Rex Cauble is over. A verdict could come tomorrow.

the witnesses against him.[3] The defendant has not filed any affidavits nor alleged specific facts which would reasonably lead to the conclusion that any of the jurors were actually exposed to the alleged prejudicial publicity.

On August 7, 1981, a ten count indictment was returned in Tyler, Texas, by a grand jury for the Eastern District of Texas. The defendant was charged in two counts with substantive violations of the Racketeer Influenced and Corrupt Organizations statute (RICO), 18 U.S.C. § 1962, in one count with conspiracy to violate the RICO statute, in four counts with misapplication of funds by a bank director in violation of 18 U.S.C. § 656 and in three counts with violations of the Travel Act, 18 U.S.C. § 1952. The substance of the offenses charged center around the defendant's alleged involvement and association with a marijuana smuggling ring referred to as the "Cowboy Mafia." The indictment alleges that 212,000 pounds of Columbian marijuana was imported into the United States aboard four shrimp boats during the time frame of the conspiracy.[4]

A jury in this case was selected, empaneled, and given preliminary instructions on January 11, 1982. The jury was specifically instructed at the beginning of the trial, and on several occasions thereafter, not to read any published reports about the case and to avoid watching or listening to any news broadcasts during the course of the trial.[5]

On the last day of testimony, January 27, 1982, counsel for Mr. Cauble brought to the attention of the Court the possibility that one of the government's rebuttal witnesses, Anita McKesson had been interviewed after she had completed her testimony by a television reporter, Quin Matthews. Defendant's counsel, attorneys for the government, and the reporter involved were asked to come in chambers to discuss the substance of the interview and whether the interview was going to be broadcast. While Mr. Matthews was not in possession of a verbatim copy of the interview, he related the substantive details of the interview to the parties and the Court. After a brief discussion among the attorneys and the Court, counsel for the defendant and the government expressly requested that the jury not be sequestered. That request was granted. Charles Burton, one of Cauble's attorneys, proposed an instruction to be given to the jury emphasizing the importance of the Court's previous instructions to avoid any publicity about the case. Following the conclusion of testimony that day, the defendant's requested instruction to avoid publicity about the case was given to the jury. Specifically, the jury was instructed as follows:

THE COURT: Members of the Jury, we're nearing the end of this trial, and hopefully your duties will be completed within the next two days. Therefore, it becomes more important than before that

3. The Sixth Amendment provides:
   In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of counsel for his defense.

4. The stories of the investigation and prosecution of several of the alleged actors in the conspiracy have reached the Fifth Circuit Court of Appeals on at least three occasions. *See United States v. Butler*, 486 F.Supp. 1285 (E.D. Tex.1980), *reversed sub nom., United States v. Hamm*, 659 F.2d 624 (5th Cir. 1981) (*en banc*);

*United States v. Hawkins*, 658 F.2d 279 (5th Cir. 1981); and *United States v. Ruppel*, 666 F.2d 261 (5th Cir. 1982).

5. Specifically, the jury was instructed as follows:
   You must avoid reading any newspaper articles that might be published about this case now that the trial is in progress, and you must also avoid listening to or observing any broadcast news program on either television or radio because of the possibility that might be made of this case during such a broadcast.
   The reason for these cautions, of course, lies in the fact that it will be your duty to decide this case solely on the basis of the testimony and evidence presented during trial without consideration of any other matters whatever.

you carefully observe the instructions previously given you by the Court concerning your reading anything about this case, or listening to, or observing any news broadcasts that might mention anything about this case. To avoid the possibility of anything like this occurring, I am therefore instructing you during the balance of the trial not to read the newspapers, or listen to the radio, or watch television during the remainder of your service as Jurors in this case.

This instruction is given to you to avoid the necessity of the Jurors being sequestered during the remainder of the trial.

Now, I know that this is a difficult task for you as Jurors in your daily lives, upsetting the routine you normally follow, but I especially request that you follow my instructions from the time you leave here today until you have completed your deliberations and rendered your verdict.

I thank you very much for your patience and your excellent attention you have given throughout this trial.

Later that day, Quin Matthews' interview with Anita McKesson was broadcast by Channel 4, KDFW–TV, Dallas, on its 6:00 P.M. and 10:00 P.M. news programs.[6]

The following day closing arguments were made by both sides and the Court's oral charge was given to the jury. The defendant did not request to voir dire the jury to determine whether any juror had actually observed the broadcasts nor did he move for a mistrial based on the publicity. Following over eight hours of deliberations, the jury returned its verdict convicting the defendant on all ten counts. The jury also found that the defendant's interest in Cauble Enterprises was subject to forfeiture as a result of his conviction on the three RICO counts. *See* 18 U.S.C. § 1963(a).

Before discharging the jury, the Court exercised its inherent power to control and supervise any investigation or inquiry that might be made concerning the deliberations of the jury pursuant to Rule 606(b), Fed.R. Evid. Counsel for both sides were instructed that neither they nor their agents would be permitted to interview any juror without the approval of the Court. The jurors were also instructed not to discuss the case with the attorneys or their investigators. Such an instruction protects former jurors against possible harassment by losing litigants and ensures that the absolute privacy of a juror's deliberations will not be scrutinized in posttrial litigation, except as provided by Rule 606(b), Fed.R.Evid. This conforms with the protections Congress sought to implement when it enacted Rule 606(b). *See* S.Rep.No.1277, 93d Cong., 2nd Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News 7051, 7060. As amended, Rule 606(b), Fed.R.Evid. provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

As quoted above, this rule expressly recognizes that "a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention." It is axiomatic that a district judge has the power, and sometimes the duty, to order that all posttrial investigation of jurors shall be under his supervision. *United States v. Moten*, 582 F.2d 654,

---

**6.** Dallas, Texas is located approximately 90 miles west of Tyler, Texas. For purposes of this motion, the Court takes judicial notice of the fact that the programs broadcast by the television stations in the Dallas-Fort Worth metroplex are available to viewers in many areas of the Tyler Division of the Eastern District of Texas.

665 (2nd Cir. 1978). The guidance of a district judge will ensure that any inquiry of jurors does not extend beyond the testimony which would be admissible under Rule 606(b). *Id.* Based on this rationale, this Court has concluded that juror interviews in this case should only be conducted under its supervision; therefore, it must be determined whether the defendant has made a showing sufficient to warrant questioning of the jurors.

■ In this regard, the Fifth Circuit has determined that "the decision to hold a hearing to determine whether juror misconduct has occurred is within the sound discretion of the trial judge and . . . his ruling will not be reversed unless it constitutes an abuse of that discretion." *United States v. Chiantese*, 582 F.2d 974 (5th Cir. 1978), *cert. denied*, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979). In cases where the alleged jury misconduct involves the possibility of juror exposure to prejudicial publicity *during the trial*, the failure to hold a hearing may constitute an abuse of discretion and reversible error. *United States v. Herring*, 568 F.2d 1099 (5th Cir. 1978). The *Herring* court, exercising its supervisory powers, reversed the conviction of a defendant because the jury had been exposed to a newspaper report that the life of government witness Gregg Allman had been threatened. *Id.* 568 F.2d at 1105 (Note 16).

■ The *Herring* court suggested that a two-step inquiry be conducted to determine whether to question the jurors about material disseminated during trial. First, a district judge should examine the nature of the published reports to determine whether the material goes beyond the record and raises serious questions of possible prejudice to the defendant. In this regard, the court should consider how closely related the material is to the case, the weight the publicity might have on any possible defenses, and the timing of the publicity. *Id.* at 1104. During part of her testimony, Anita McKesson stated that she told her husband, a former pilot for Cauble Enterprises, that she had obtained some information on Rex Cauble and that she was terrified for her husband to continue flying for Mr. Cauble. In the interview with Quin Matthews on the day of her testimony, it was reported that Mrs. McKesson was employed by the Tarrant County District Attorney and that in 1977 the D.A.'s office had gotten information that Cauble was a drug smuggler.[7] Whether this information might possibly prejudice the jury is a close question.[8]

The second step of the sequential analysis suggested in *Herring* requires the judge to determine the likelihood that the damaging material reached the jury. In this step, the judge should consider whatever precautions have been taken to insulate the jury, the nature of the previous instructions and the length of time since the last instruction. *Id.* at 1105. Whether the *Herring* criteria are applicable to posttrial motions to interview the jury regarding midtrial publicity is not clear.[9] Assuming such an analysis is required in this case, resolution of the second inquiry suggested in *Herring* eliminates the need to determine the first inquiry. That is, it need not be determined whether the defendant has established that the Anita McKesson interview goes beyond the record to raise serious questions of possible prejudice, because this Court is satisfied that the jurors were not exposed to the publicity complained of. Even though the jury was not sequestered, the jurors were specifically instructed only a short time pri-

7. See footnote 1 for the substance of the interview and the Appendix for Anita McKesson's testimony.

8. The testimony and alleged interview of Stuart Dowell are not so troublesome. There was other testimony presented during the trial which indicated that Cauble's employees had been suspected of illegal drug activities relating to activities on one of Cauble's ranches on prior occasions. See footnote 2.

9. In situations where a defendant does not learn of facts which might support a finding of juror partiality until after the verdict, a posttrial hearing may be necessary in order to allow the defendant to prove actual bias. *Smith v. Phillips*, —— U.S. ——–——, 102 S.Ct. 940, 944, 70 L.Ed.2d —— (1982), (50 U.S.L.W. 4190, 4192); *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

or to the broadcasts not to watch television, listen to the radio, or read any newspapers. Given the close proximity in time to the challenged news broadcasts, the Court will rely on the presumption that the jurors followed the instruction. *Estes v. United States*, 335 F.2d 609 (5th Cir. 1964), *cert. denied* 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965). Alternatively, the defendant has waived his right to object to the alleged prejudicial publicity by failing to ask that the jury be examined about the publicity prior to the time the jury returned its verdict. *See United States v. Gersh*, 328 F.2d 460, 463 (2d Cir.), *cert. denied* 377 U.S. 992, 84 S.Ct. 1919, 12 L.Ed.2d 1045 (1964). *Gersh* implies that a defendant waives his right to object if counsel had knowledge of a possible prejudicial outside influence prior to the completion of the jury's deliberations yet "stands mute, gambling on acquittal while holding this issue in reserve." *Id.*, 328 F.2d at 463. In this case, as contemplated in *Gersh*, the defendant's attorneys were cognizant of the McKesson interview. The defendant, through his counsel, acquiesced in the decision not to sequester the jury and participated in the drafting of the cautionary instruction. The defendant elected to gamble and "roll the dice with the jury," without objecting or requesting that any action be taken in response to the broadcast of either interview.[10]

The government also contends that the defendant has failed to come forth with any evidence that any juror was influenced by extraneous prejudicial information. This Court agrees. The overwhelming weight of judicial authority supports the proposition that a convicted defendant is not entitled to probe into the function of the jury unless he or she makes a substantial showing that some kind of outside influence may have tainted the jury's deliberations. *Machibroda v. United States*, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962) (specific and detailed factual assertions); *King v. United States*, 576 F.2d 432 (2d Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978) (requiring "clear evidence," "strong evidence," or "substantial if not wholly conclusive evidence"); *United States v. Eagle*, 539 F.2d 1166 (8th Cir.) *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1976) (requires specific allegations of ability to adduce evidence adequate to prove grounds to overturn the verdict.) In this case, the defendant has not alleged any specific acts of misconduct on the part of any juror which would warrant a judicially supervised journey into the sanctity of the juryroom. When reasonable grounds to investigate the conduct of jurors exist, the matter should be explored; however, in cases like this where the defendant relies on speculation unsupported by any evidence, "a convicted defendant should not be allowed ... to conduct a fishing expedition" into the activity of the jury. *United States v. Moten, supra*, 582 F.2d at 666–667. There is nothing in the record to indicate that the media's coverage of the case compromised the ability of the jury to weigh the evidence fairly.

Having concluded that the defendant has failed to satisfy the *Herring* criteria, and that he has not otherwise made a showing sufficient to justify posttrial voir dire or interviewing of the jurors, the defendant's motions will be denied. Accordingly, it is ORDERED that the Defendant's Motion for Waiver of Prohibition of Post Trial Juror Interviews and that the Request for Special Hearing on the question of publicity be and hereby are DENIED.

### APPENDIX

MR. WORTHAM: At this time, we would call Mrs. Anita McKesson.

MR. MINTON: Excuse me, Your Honor. May we approach the bench?

REPORTER'S NOTE: A conference was had between Court and Counsel out of the hearing of the Reporter.

---

10. Four alternate jurors observed the entire trial proceedings and were available to serve as jurors in the event a replacement was needed for any juror who failed to observe the Court's instructions.

ANITA McKESSON,

having been first duly cautioned and sworn to testify the truth, the whole truth and nothing but the truth, did testify as follows:

## DIRECT EXAMINATION

BY MR. WORTHAM:

Q. Good afternoon. Would you state your name for the record, please?

A. Anita McKesson.

Q. Now, would you spell your last name for the Court Reporter?

A. M-c K-e-s-s-o-n (spelling).

Q. I am having a hard time hearing you. Could you speak up a little bit?

THE COURT: Pull the mike a little bit forward.

THE WITNESS: Okay.

THE COURT: A little more.

THE WITNESS: Okay. Is that going to be too loud?

THE COURT: We will see.

BY MR. WORTHAM:

Q. Where do you live?

A. Burleson, Texas.

Q. To whom are you married?

A. Bill McKesson.

Q. Is he the same individual that testified here last Monday and the Thursday prior to that?

A. Yes, sir, he is.

Q. Do you know of your own personal knowledge whether or not your husband ever worked for Mr. Rex Cauble?

A. Yes, sir, he did.

Q. Do you know how he was employed?

A. He was a pilot for Rex Cauble.

Q. Do you also know whether or not your husband was quit or whether he was fired?

A. He quit.

Q. How do you know this?

A. Because after he returned from the trip from Thomasville, Georgia, we discussed at length the events of that trip and discussed the fact that he should quit.

Q. Did you have any input into this conversation?

A. Yes, I certainly did.

Q. What were your feelings?

A. I told him that I had just obtained some information on Rex Cauble and that I was terrified for him to continue flying for him and that I wanted him to quit. In fact, if he had not made the decision to do so I would have insisted because I was afraid for his safety and the safety of my family.

MR. WORTHAM: Pass the witness.

THE COURT: Mr. Minton, you can put your objection on the record as to this being hearsay.

MR. MINTON: All right, sir.

THE COURT: Which is what transpired at the bench.

Go ahead and state your objection.

MR. MINTON: All right, sir.

We would object to all of the testimony that she has given concerning what her husband—What she has testified to as what her husband said, as being hearsay.

THE COURT: All right.
Overruled.

MR. MINTON: All right.
May I cross examine, Judge?

THE COURT: Is he through?

MR. WORTHAM: Sir?

THE COURT: Are you through?

MR. WORTHAM: Judge, may I ask her a few more questions before you take her on cross?

THE COURT: Yes.

BY MR. WORTHAM:

Q. What is it that your husband told you when he returned from Thomasville, Georgia?

A. He told me that on the trip to Thomasville that he and Mr. Foster, "Muscles" Foster, went to the home of Ray Hawkins and there some characters came in and met with them and that Mr. Foster and some of the other men, Mr. Haw-

kins and someone else, went into another room; Mr. Foster returned and he and Bill left immediately. And that on the way back to the airport Mr. Foster told him to hit the ground running, get the plane in the air and to get out of there as quickly as possible. During the trip back Mr. Foster—My husband said that Mr. Foster opened the briefcase and showed him a large sum of money and told my husband that there was $250,000.00 in there but that wasn't all of it and that they were going to have to go back and get the rest of it at a later date. He also told my husband that he was asking way too many questions about what was going on and that was going to get him in a whole lot of trouble. During that trip back bad weather caused them to have to stop over in, I believe, Monroe, Louisiana, where they spent the night. He said Mr. Foster was very nervous and—They stayed in the same room, and that all during the night Mr. Foster kept getting up and checking that briefcase; opening it, looking into it and cutting the light off. Then the next morning when they went back to the airport two police officers showed up there and Mr. Foster became very alarmed and told him they needed to get out of there and for him not to make any contact with any agency, he didn't want him talking to anyone. And they went ahead and left and flew back to Denton, returned on the trip.

MR. WORTHAM: Pass the witness.

### CROSS EXAMINATION

BY MR. MINTON:

Q. Did your husband quit the next day, Mrs. McKesson?

A. I don't know if it was the next day.

Q. Did he fly for him thereafter?

A. He could have.

Q. All right.

As far as you know, he continued to fly for him for some period of time, you just don't know?

A. Our discussion was that he would not make any more trips to Thomasville, Georgia, nor to Las Vegas. That was one thing I said for sure. I didn't know what day he was going to quit on but I said he would not make any more trips there.

MR. MINTON: That's all I have. Thank you.

### REDIRECT EXAMINATION

BY MR. WORTHAM:

Q. After your husband quit Cauble Enterprises, were you present when he had a conversation with a man by the name of Roy Graham?

A. Yes, sir, I was.

Q. Did you hear what your husband was telling him?

A. Yes, I heard his side of the conversation. He told Roy Graham the entire story as to why he had quit and in fact I was very concerned and showed my emotion during this conversation. When he finished and hung up I said, "Don't be discussing information you know about Rex Cauble with Rex Cauble's friends." And he said, "Well, Roy told me that they had offered him $25,000.00 to find a boat and another $25,000.00 to find a place to dock it." And that Roy said he was trying to get out of that mess.

MR. WORTHAM: Pass the witness.

MR. MINTON: No questions, Your Honor.

THE COURT: All right.

Do you want to excuse this witness?

MR. WORTHAM: Yes, Your Honor.

THE COURT: You are excused.

(Witness excused)