**Johnny SPAIN, Petitioner,**

v.

**Ruth RUSHEN, Director, California Dept. of Corrections, Jess Marquez, Superintendent, California Medical Facility, Vacaville, Cal., Respondents.**

**No. C 81–4858 TEH.**

United States District Court,
N. D. California.

June 29, 1982.

■■■■■■■■■■■■■■■■

Dennis Riordan, Acting Deputy State Public Defender, Benjamin Dreyfus, Charles Garry, San Francisco, Cal., for petitioner.

Ronald Niver, Deputy State Atty. Gen., San Francisco, Cal., for respondents.

## OPINION AND ORDER

HENDERSON, District Judge.

This case is before the Court on Spain's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Petitioner claims that he is in custody pursuant to a judgment of conviction that is constitutionally defective as a result of events that occurred at his trial. First, Spain contends that *ex parte* communications that took place during his trial between a juror and the trial judge deprived him of his constitutional rights to assistance of counsel and to be present at a critical stage of his trial. Second, the Petitioner asserts that his Due Process right to be presumed innocent at trial was violated when he was forced to stand trial while shackled and chained. For the reasons set forth below, this Court is compelled to issue the writ.

## I. FACTS

The petition for writ of habeas corpus arises out of Spain's trial as one of a group of defendants popularly known as "The San Quentin Six." The trial, which began in 1975, concerned August, 1971 events at San Quentin Prison that resulted in the death of George Jackson and five others. At the time these events occurred, Petitioner Spain was incarcerated on a first degree murder conviction.

The indictment on which the defendants were tried contained twelve counts, including conspiracy to escape by force or violence, assault, and murder in the deaths of two prisoners and three correctional officers. All of the defendants were charged and tried on the conspiracy and murder counts. The trial began on March 25, 1975 and ended on August 12, 1976 after twenty-four (24) days of jury deliberation. Three of the six defendants were acquitted on all counts. One was convicted of one count of assault, and another of two counts of assault. The remaining defendant was Johnny Spain.

Spain, the only defendant who was a member of the Black Panther Party, was the only defendant convicted of conspiracy and/or murder. On a theory of vicarious liability arising out of the conspiracy conviction, Spain was convicted of murder in the deaths of two of the three correctional officers who died in the escape attempt allegedly led by George Jackson. *People v. Spain, Pinell, and Johnson*, No. 1/Crim. 16126 at 2 (California Ct.App., July 24, 1980) [hereinafter cited as Ct.App.Opinion]. Consistent with the vicarious liability theory, Spain was acquitted of murder in the deaths of the third correctional officer and the two prisoners. *Id.*

The relevant portions of the record at trial and on appeal have been lodged with the Court [1] and thoroughly reviewed. The facts bearing on the petition are not in dispute and are set out in detail in the parties' able briefs and in the unpublished opinion of the California Court of Appeal affirming the convictions of Spain and the other two convicted defendants, *People v. Spain, Pinell, and Johnson*, No. 1/Crim. 16126 (July 24, 1980). To the extent that factual findings pertinent to the issues raised here were made by the California Court of Appeal, those findings are pre-

---

1. The records referred to were lodged with the Court in connection with the case of *Spain v. Rushen, et al.*, C 81–2738 TEH, which was dismissed without prejudice by this Court on November 24, 1981. *See* discussion of Procedural Background, this Opinion, *infra*, at pages 763–64. The earlier case is related to the instant action within the meaning of Local Rule 205–2(b), and judicial notice is hereby taken of the entire record in C 81–2738 TEH. Fed.R. Evid. 201.

sumed to be correct. *Sumner v. Mata,* —— U.S. ——, ——, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982) (*per curiam* ); 28 U.S.C. § 2254(d).

With respect to the *ex parte* communications between judge and juror, the facts are as follows. Jury selection took thirty-nine trial days. The sensational nature of the 1971 events and the Black Panther membership of George Jackson and Petitioner Spain prompted voir dire concerning both violence and perceptions of the Black Panther Party. The California Court of Appeal described the pre-trial voir dire as follows:

> Fagan [the juror who had *ex parte* communications with the trial judge], during the voir dire of the venire, was shown a videotape of the trial judge's admonishing prospective jurors of the importance of revealing any association with crimes of violence and attitudes toward radical groups, specifically the Black Panther Party. Fagan was asked:
>
> "Q. How about crimes of violence? Any knowledge of that at all?
>
> "A. No.
>
> "Q. Witness, victim, otherwise?
>
> "A. No.
>
> " . . .
>
> "Q. Have you heard of the Black Panther Party?
>
> "A. Yes.
>
> "Q. Do you associate the Black Panther Party with any form of violence in your own mind?
>
> "A. No."

Ct.App.Opinion at 9.

During the defense case at trial, a witness for Spain testified that the 1971 events for which Spain and the other defendants were on trial resulted from a police plot to eliminate a group of Black Panthers by setting up a Panther "rescue" of George Jackson and then ambushing the entire group. The witness identified a Black Panther named Pratt as a police informant involved in the plot as leader of the "rescue" group. Pratt, however, had been in custody for the 1968 murder of a Santa Monica woman during the entire period of the alleged rescue plot. This information about Pratt's whereabouts and the reasons therefor was used to impeach the defense witness on cross-examination. *Id.* at 9–10; *see also* Examination of Juror Fagan at Post-trial hearing, Trial Court Transcript 23957:2–8 [hereinafter cited as C.T.].

During a recess on the day of this cross-examination, Juror Patricia Fagan went to the chambers of trial Judge Henry J. Broderick and told him that she suspected that the 1968 murder referred to in cross-examination was the murder of her friend, Carolyn Olson, by a Black Panther Party member. Record on Appeal, 5480:28—5481:13 [hereinafter cited as R.App.]; C.T. 23919:7–11; Ct.App.Opinion at 10. Ms. Fagan told the judge that, if the matter were gone into further, she might start to cry in the courtroom. R.App. 5481:13–14; Ct.App.Opinion at 10. Judge Broderick indicated that it was unlikely that the 1968 murder referred to was that of her friend and told Ms. Fagan not to concern herself with it. R.App. 5481:14–17; C.T. 23919:25–28; Ct. App.Opinion at 10. The judge also asked Ms. Fagan whether Pratt's association with her friend's murder would affect her disposition of the case. Ms. Fagan responded in the negative. C.T. 23919:20–24; Ct.App. Opinion at 10. No record was made of the conversation and neither the parties nor their counsel were informed of its occurrence at the time it took place. Ct.App. Opinion at 11.

That evening, Ms. Fagan asked her mother the name of the person who killed her friend Olson, and her mother informed her that it was Pratt. R.App. 5481:18–20; Ct. App.Opinion at 10.

The next day, Ms. Fagan went to see Judge Broderick again to inform him that she had confirmed that the testimony given on the previous day related to the death of her friend. R.App. 5481:21–23; C.T. 23920:1–4; Ct.App.Opinion at 10–11. Ms. Fagan reiterated the effect that renewed discussion of the 1968 murder might have on her composure. R.App. 5481:23–25; C.T. 23920:4–10; Ct.App.Opinion at 11. The judge advised Ms. Fagan that the lawyers

probably would not go into the matter further, and asked again whether Ms. Fagan's disposition toward the case would be affected by the information in her possession. *Id.* Ms. Fagan responded that she would be very unsettled if Pratt were called to testify. *Id.* No record of this second conversation was made and none of the parties was informed of its occurrence. Ct.App.Opinion at 11.

Juror Fagan's second conversation with Judge Broderick took place on Friday. Evidence was presented the following Monday, the next trial day, that Pratt was a leader of the Black Panther Party in Los Angeles. *Id.* at 12.

Despite the cross-examination question posed by the prosecutor concerning Pratt's incarceration for murder, no admissible evidence was introduced that Pratt in fact had killed or been convicted of killing Carolyn Olson. *Id.* at 11. Juror Fagan, however, told other jurors that Pratt had been convicted of murdering a friend of hers. R.App. 5482:2–3; Ct.App.Opinion at 11; *see also* Examination of Juror Fagan at post-trial hearing, C.T. 23971:24–23972:1, 23978:27–23979:1.[2] Ms. Fagan, in an affidavit submitted in opposition to Spain's motion for a new trial, denied that she made any derogatory comments about the Black Panther Party in her conversations with other jurors concerning the death of her friend. R.App. 5482:2–7; Ct.App.Opinion at 11.

Following the testimony pertaining to Pratt, Spain presented evidence of his Black Panther Party membership. Ct.App.Opinion at 12. In his closing statement, the prosecutor argued to the jury that the Black Panther Party helped to smuggle weapons or ammunition to Jackson "and implied that Spain's party membership was evidence that he, too, was 'involved in' the escape plan and 'working with' [George] Jackson." *Id.* at 5–6.

Counsel for Spain learned of the conversations between Juror Fagan and Judge Broderick after the jury returned its ver-

dict. A motion for new trial based on these conversations was promptly filed. R.App. 5437 *et seq.* Ms. Fagan's affidavit was submitted as part of the record at the hearing on the new trial motion, at which Ms. Fagan testified. In her affidavit, Ms. Fagan stated that she associated the Black Panther Party with worthwhile activities and that at the time of pre-trial voir dire the death of her friend was not in her mind. R.App. 5482:7–18. No other jurors testified at the hearing on the motion for a new trial, at which Judge Broderick presided. The motion was denied in October, 1976. C.T. 24013:12–20414:7.

The pertinent facts with respect to the shackling of the Petitioner at trial are as follows. Spain was indicted in October, 1971. From the time of his indictment through his conviction in 1976, the Petitioner was shackled during his appearances in state court. Prior to leaving his cell each morning, Spain, like the other incarcerated defendants, was placed in leg irons and belly chains, and his hands were bound to his waist chain through the use of additional chains and handcuffs. Once in the courtroom, Spain's waist chain was shackled to his chair, which was bolted to the floor. Beyond these restraints applied to the individual defendants, an elaborate system of courtroom security was employed, including guards armed with machine guns, a bullet proof barrier, body frisks, and metal detectors.

During the pre-trial period, defendants, including Spain, filed several motions requesting that they be unshackled, all of which were denied. *See, e.g.,* C.T. 1161, 1165–66. A motion to reconsider the question of shackling at trial was filed on March 7, 1975 and denied on March 14, 1975. The jury trial commenced on March 25, 1975 with the defendants shackled in the manner described above.

During the course of trial, Judge Broderick made no express finding as to why Petitioner Spain was shackled. On October

---

**2.** The record is unclear as to when, precisely, Ms. Fagan conveyed this information to other jurors, though it was clearly before the verdicts were reached.

1, 1976, just prior to sentencing, the trial judge orally addressed the subject of the restraints imposed during trial. C.T. 23994–24003. Petitioner Spain's attorney objected to the judge's statements on the ground that the court should not be permitted to state self-serving reasons for its actions at such a late date, having refused to hold a hearing on the question of restraints during trial. Judge Broderick, however, expressed concern that the appellate court be able to review the decision to maintain the physical restraints during trial. Judge Broderick therefore introduced into evidence two court exhibits documenting the reasons for his decision with respect to shackling. Court Exhibit 17 is a bound volume entitled "Composite Behavior Report," consisting of security incident reports submitted to Judge Broderick during the trial. Exhibit 18 is a set of videotapes of misconduct by the defendants during the trial.[3]

Exhibits 17 and 18 reveal that, while the trial was in progress, Petitioner Spain engaged in the following misconduct:

1. Throwing a file toward the jury as jurors were being sworn. June 12, 1975.

2. Generalized threat to a correctional officer while at San Quentin. ("What goes around comes around.") June 12, 1975.

3. Throwing spitballs at court participants. June 23, 1975.

4. Handing defendant Pinell a pencil thereafter thrown by Pinell towards the well of the courtroom following the close of the day's proceedings. June 24, 1975.

5. Making noise by rubbing chains across chair arm during reading of the indictment. July 28, 1975.

6. Urinating on courtroom floor while waiting to be returned to San Quentin after close of the day's proceedings. January 30, 1976.

7. Throwing "unknown instrument" at opening in cell door at San Quentin, striking the hand of a correctional officer that was protruding into the cell. February 26, 1976.

8. Throwing shoe at cell door at San Quentin as correctional officer was walking by. February 27, 1976.

9. Intentionally bumping defendant Talamantez while in transit from San Quentin to court. February 27, 1976.

10. Throwing water at six security officers who were restraining a co-defendant during court recess. April 12, 1976.

11. Indecent and unacceptable verbal responses to questions from correctional officers at San Quentin, resulting in security incident report on May 13, 1976.

12. Illegal possession of medication at San Quentin. June 21, 1976.

13. Yelling threat and obscenities at correctional officers at San Quentin. July 12, 1976.

14. Verbal belligerence with security officers during court recess. July 12, 1976.

The initial decision to shackle Petitioner Spain was made at his indictment, before any of Petitioner's disruptive acts occurred. The decision to keep Spain in shackles throughout the trial was presumably based on Spain's conduct in the courtroom and on the out-of-court behavior reported to Judge Broderick by the security team at San Quentin, all of which is itemized in chronological order in the foregoing list.

## II. PROCEDURAL BACKGROUND

Petitioner Spain filed a notice of appeal to the California Court of Appeal on October 1, 1976, the same day that the judgment

---

**3.** The existence of Exhibits 17 and 18 came to the attention of this Court after the March 15, 1982 hearing on the Order to Show Cause. The Court promptly contacted the Deputy Attorney General handling this case on behalf of the State of California. As the result of the State's diligent efforts, a copy of Exhibit 17 and the original of Exhibit 18 were obtained and lodged with the Court on May 21, 1982.

of conviction was entered against him. R.App. 5507–5508, 5512. Nearly four years later, Spain's conviction was affirmed by the Court of Appeal, which considered both of the issues raised by the instant petition. With respect to the *ex parte* communications between Juror Fagan and the trial judge, the state appellate court found that though federal constitutional error was committed, that error was shown by the State to be harmless beyond a reasonable doubt. Ct.App.Opinion at 13–19. As to the shackling of the defendants at trial, the Court of Appeal ruled that even if the shackling were assumed to constitute a due process violation, the resulting error was not prejudicial to the defendants. *Id.* at 19–20.

The California Court of Appeal opinion was filed on July 24, 1980. A Petition for Hearing before the California Supreme Court was served on September 2, 1980. The California Supreme Court denied a hearing, issuing an order to that effect on October 15, 1980.

On June 29, 1981, Spain filed a petition for writ of habeas corpus in this Court, raising issues identical to those now before the Court. *Spain v. Rushen, et al.,* C 81–2738 TEH. At a November 2, 1981 hearing on that petition, counsel were alerted to the Court's concerns regarding exhaustion of state remedies on the shackling issue. Spain promptly filed, on November 5, 1981, a petition for writ of habeas corpus raising the shackling issue in the California Supreme Court.

On November 24, 1981, this Court dismissed without prejudice Spain's petition in C 81–2738 TEH for failure to exhaust state remedies on the shackling issue.[4]

On December 23, 1981, the California Supreme Court denied without a hearing

Spain's petition for writ of habeas corpus. *In re Johnny Spain,* Crim. No. 22325 (Cal. Sup.Ct. Dec. 23, 1982). On December 31, 1981, Spain filed the petition that is now before the Court. A hearing in this case was held on March 15, 1982. With this procedural and factual background established, we now turn to a discussion of the merits of Petitioner Spain's claims.

## III. DISCUSSION

A. *Communications between juror and judge.*

1. *Constitutional error.*

Consistent with the California Court of Appeal decision in this case, the Respondents here do not dispute that, as a result of the *ex parte* communications that took place during trial between Juror Fagan and Judge Broderick, Petitioner Spain was denied his federal constitutional rights to be present at a critical stage of his trial and to be represented by counsel. Absent a violation of the United States Constitution, it would be error for this Court to issue a writ of habeas corpus. *Smith v. Phillips,* —— U.S. ——, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982). The Court of Appeal decision and the Respondents' concession notwithstanding, to the extent that finding a constitutional violation requires the application of legal standards to historical facts, the existence of such a violation must be independently determined by this Court. *Sumner v. Mata, supra,* 102 S.Ct. at 1306–07; *Pierre v. Thompson,* 666 F.2d 424, 427 (9th Cir. 1982); *see also Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). Furthermore, a determination of the fact and nature of the constitutional error here is necessary to a full understanding of the dispute between the parties concerning the standard of review to be applied in this case.

---

4. The Ninth Circuit's "total exhaustion" rule, which this Court viewed as mandating dismissal of Spain's earlier-filed petition, has since been adopted by the United States Supreme Court. *Rose v. Lundy,* —— U.S. ——, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). The Court notes, however, that the interpretation of California Supreme Court Rules which gave rise to the exhaustion concern resulting in dismissal in C

81–2738 TEH is undermined, if not rejected, by the Ninth Circuit's opinion in *Maxwell v. Sumner,* 673 F.2d 1031, 1034 n.1 (9th Cir. 1982), a case decided before *Rose v. Lundy. See generally* re exhaustion, Lynn and Bolz, *Federal Habeas Corpus Review of State Criminal Cases,* in *Appeals and Writs in Criminal Cases,* §§ 4.25–4.42 (California Continuing Education of the Bar 1982).

The California Court of Appeal, reviewing this aspect of the case, perceived the issue before it as

aris[ing] at the confluence of three streams of constitutional doctrine, flowing from the right of defendants in criminal proceedings to trial by an impartial jury, their right to be personally present during the proceedings, and their right to be represented by an attorney.

Ct.App.Opinion at 12. Only the latter two aspects of constitutional doctrine are raised by Spain before this Court. We note, however, extending the California Court's metaphor, that the right to be tried by an impartial jury is an ever-present undercurrent in the right to be present and the right to counsel claims made here by the Petitioner.

Focusing first on the right of a criminal defendant to be physically present at a critical stage of the trial, we note at the outset that this right is not one enumerated in the United States Constitution. Nonetheless, the Supreme Court has recognized the constitutional stature of rights essential to due process of law in a fair adversary proceeding, and has identified as one such right that of the accused in a criminal proceeding "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819 n.15, 95 S.Ct. 2525, 2533 n.15, 45 L.Ed.2d 562 (1975). *See also Badger v. Cardwell*, 587 F.2d 968, 970 (9th Cir. 1978).

■ The constitutional right to be present thus extends to conferences between judge and juror, at least where the defendant's absence could, under some set of circumstances, be harmful. *United States v. Walls*, 577 F.2d 690, 697–98 (9th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978). The circumstances of this case leave no doubt that Petitioner

Spain's absence during the conversations between Juror Fagan and Judge Broderick might have frustrated the fairness of the trial and that the Petitioner's absence therefore violated his constitutional right.[5]

■ The right to jury trial in criminal cases, guaranteed in state proceedings by force of the Fourteenth Amendment, *Duncan v. State of Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), encompasses the right to trial by an *impartial* jury. U.S.Const. amend. VI (emphasis supplied). Stressing this impartiality requirement at note 10 of its opinion in *Turner v. State of Louisiana*, the Supreme Court observed that

The requirement that a jury's verdict "must be based upon the evidence developed at trial" [*Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) ] goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury. "The jury is an essential instrumentality—an appendage—of the court, the body ordained to pass upon guilt or innocence. *Exercise of calm and informed judgment by its members is essential to proper enforcement of law.*" Sinclair v. United States, 279 U.S. 749, 765 [49 S.Ct. 471, 476, 73 L.Ed. 938 (1929) ] ...

379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965) (emphasis supplied). The content as well as the fact of the conversations between Juror Fagan and Judge Broderick indicate that the "fundamental integrity of all that is embraced in the constitutional concept of trial by jury" was in question during those discussions.

■ During her second conversation with the trial judge, Ms. Fagan let it be known that she had somehow confirmed what, during their first conversation, she had only suspected—that the Pratt about whom tes-

---

5. As the definition of the right indicates, a finding that the right to be present has been violated does not necessarily mean that the proceedings were *per se* unfair. Rather, a determination that the constitutional right was violated means only that the defendant's absence occurred under circumstances that might

give rise to a deprivation of fundamental fairness. As to the separate question of whether a violation of the right requires issuance of the writ sought here, *see* discussion of Standard of Review, this Opinion, *infra*, at pages 768–777.

timony was being given had murdered her friend. Ms. Fagan thus conveyed to Judge Broderick that she had at her disposal information not introduced at trial, either as evidence or otherwise.[6]

Furthermore, that the information she possessed was extremely disturbing to Ms. Fagan is revealed not only by what Ms. Fagan told Judge Broderick about her emotional state, but also by the fact that the conversations with him occurred at all. Juror Fagan told the judge, not once but twice, that continued discussion at trial of her friend's death might be so emotionally disturbing as to cause her to cry. The truth of Ms. Fagan's statements about her emotional condition is apparent from the fact that, in order to approach Judge Broderick, Ms. Fagan had to overcome an explicit admonition from the judge himself not to discuss the case with anyone. C.T. 23971:24–26. An issue so troubling that it provokes an apparently conscientious juror [7] to breach a clear instruction from the court at least raises concerns about the person's ability to continue to be an impartial juror, concerns reinforced by the obvious emotional impact that the testimony triggering the conversations with the judge had on the juror.

During each of the two discussions he had with Ms. Fagan, Judge Broderick inquired whether Ms. Fagan felt that she could dispose of the case fairly despite the information in her possession. This fact confirms that the content and nature of the conversations posed for the trial judge, as for this Court, questions about Ms. Fagan's fitness to continue to serve as a juror. When these *ex parte* communications occurred, questions thus arose as to whether the essential elements of trial by an impartial jury, as articulated by the Supreme Court in *Turner v. State of Louisiana, supra,* continued to be

satisfied. Petitioner Spain's absence from conversations implicating a juror's ability to judge impartially the case against him presented the same possibility for frustrating the fairness of the proceedings as would his absence from initial voir dire. *See United States v. Crutcher,* 405 F.2d 239, 242–43 (2nd Cir.), *cert. denied,* 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1968). *See also* Fed.R.Crim.P. 43(a); *United States v. Alessandrello,* 637 F.2d 131, 138 (3rd Cir. 1980), *cert. denied,* 451 U.S. 949, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981) (Fed.R.Crim.P. 43 encompasses constitutional rights re exclusion from pre-trial voir dire of jury). We are compelled to conclude, therefore, that the failure to provide for Spain's presence during the conversations between Judge Broderick and Juror Fagan deprived him of his constitutional right to be present at a critical stage of his trial.

We turn next to the Petitioner's claim that the *ex parte* communications between Ms. Fagan and the trial judge deprived him of his right to counsel as guaranteed by the Sixth and Fourteenth Amendments to the Constitution. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Although the right to counsel is not absolute, it is fundamental to our system of justice in that it is meant to assure fairness in the adversary criminal process. *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981). Consistent with this purpose,

> the right to the assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process that has been constitutionalized in the Sixth and Fourteenth Amendments.

*Herring v. New York,* 422 U.S. 853, 857, 95 S.Ct. 2550, 2553, 45 L.Ed.2d 593 (1975).

---

**6.** Based on the post-trial hearing, the trial court found that Ms. Fagan's failure to reveal this information at the pre-trial voir dire was not willful. C.T. 24013:18–28. Petitioner Spain does not challenge that finding, and we presume it to be correct. 28 U.S.C. § 2254(d).

The Respondent's argument that the information in Ms. Fagan's possession did not relate to

a fact in controversy at trial is discussed, *infra,* at pages 772–73 of this Opinion.

**7.** At the time that these conversations with Judge Broderick occurred, Ms. Fagan had been sitting on the jury, evidently without incident, for over eight months. *See* Ct.App. Opinion at 13.

■ Among the "traditions of the adversary factfinding process" constitutionalized in the Sixth and Fourteenth Amendments is the right to be tried by an impartial jury. U.S.Const. amend. VI; *Duncan v. State of Louisiana, supra,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491. Thus, paraphrasing the Supreme Court in *Herring,* there can be no restrictions on the function of counsel in defending a criminal prosecution in accord with the right to a trial by an impartial jury. That the right to be so tried was put in issue by the conversations between Juror Fagan and Judge Broderick is clear from the foregoing discussion of Petitioner Spain's right to be present during those conversations. The absence of Spain's counsel from those same conversations prevented the attorney from protecting the fundamental integrity of his client's trial by jury and thus violated Spain's Sixth Amendment right to counsel.

In circumstances such as those presented here, the lawyer's function in protecting a client's right to trial by an impartial jury has several facets. When there are mid-trial indications that a juror may be unfit to continue to serve on the jury, defense counsel's first objective would be to determine, by either direct or indirect participation in voir dire of that juror, whether the person in fact remains qualified to sit on the jury. If, as a result of that voir dire, the juror is found to be biased or otherwise unfit to serve, counsel would seek to have that juror removed and replaced by an alternate if possible. Even if the juror were found fit to continue to serve, however, a competent lawyer would have the remaining objective of preventing the voir dire of the juror thereby "contaminated" from coming to the attention of other jurors in a way that might be prejudicial to the defendant. Counsel would thus seek to have the court instruct the voir dired juror so as to severely limit if not eliminate conversations with other jurors about the nature and content of the mid-trial voir dire, thereby minimizing the possibility that other jurors would be tainted by either the fact or the substance of that voir dire.

In this case, because the trial judge never informed the parties of his conversations with Ms. Fagan, Spain's lawyer never had the opportunity to accomplish these goals.[8] In light of the nature of the information revealed to Judge Broderick by Ms. Fagan, the words of Mr. Justice Sutherland in *Powell v. Alabama* seem particularly germane to this case.

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law .... *Left without the aid of counsel he may be* put on trial without a proper charge, and *convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible....* He requires the guiding hand of counsel at every step of the proceedings against him.

287 U.S. 45, 68–69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932) (emphasis supplied).

---

**8.** Thus, though the right to counsel protected by the Sixth Amendment is subject to waiver, *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), no suggestion has been or could be made that the right was waived in this case. It is appropriate to note in this context that Supreme Court cases

> have consistently recognized the important role the trial judge plays in the federal system of criminal justice. "The judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct ..."

*Geders v. United States,* 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976). Though the cases establishing this principle generally involve federal court trials, the role of the state court trial judge in assuring the proper conduct of the trial by protecting the defendant's federal constitutional rights is no less important. Fulfillment of this role is essential to minimize federal intrusion into state criminal proceedings. *See Engle v. Isaac,* —— U.S. ——, 102 S.Ct. 1558, 1571–72, 71 L.Ed.2d 783 (1982). We note also the Supreme Court's observation, in a case involving collateral attack on a state criminal conviction, that "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips, supra,* 102 S.Ct. at 946.

### 2. *Standard of review.*

Constitutional error having thus resulted from the *ex parte* communications between Ms. Fagan and Judge Broderick, we now must scrutinize the effect of that error on Petitioner Spain's conviction and thus the appropriateness of habeas corpus relief under the circumstances presented here. Such an examination involves the two-step process of determining the standard of review applicable to the constitutional violation at issue and of applying that standard to the facts before us.

■ As the foregoing discussion makes clear, the right to presence and the right to counsel violations that occurred are closely related. The interests protected by Spain's presence would have been protected and furthered had Spain's counsel alone participated in a mid-trial voir dire of Ms. Fagan. *See Powell v. Alabama, supra,* 287 U.S. at 68–69, 53 S.Ct. at 64, and this Opinion, *supra,* at page 767. This congruence of the rights at issue permits us to focus on the standard of review governing the right to counsel violation that occurred here. An examination of the standard of review applicable to the right to presence violation would add nothing to the analysis.[9]

■ The State takes the position that the California Court of Appeal was correct in applying the harmless error test to the violation of Spain's right to counsel. Spain argues that the nature of the violation here

requires automatic reversal of his conviction. The principles that govern resolution of this dispute between the parties are enunciated and analyzed in depth by the Ninth Circuit sitting *en banc* in *Cooper v. Fitzharris,* 586 F.2d 1325, 1331–33 (9th Cir. 1978), *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979), and were recently summarized in *Slappy v. Morris,* 649 F.2d 718, 722–23 (9th Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 1748, 72 L.Ed.2d 160 (1982). Proper application of those principles to the right to counsel deprivation that occurred in this case dictates the automatic reversal of Spain's conviction.[10]

As described by the Ninth Circuit in *Cooper,* right to counsel cases are separable into two groups: one group in which the harmless error test applies, and a second group in which violation of the right results in automatic reversal of the conviction. By examining the circumstances surrounding the right to counsel violation in each of these groups, the Court of Appeals identified the factors that are critical to determining into which group a given case falls.

In the group of cases to which the harmless error test applies, the constitutional error occurs under circumstances that permit a reviewing court to determine from the record whether deprivation of the right to counsel was harmless beyond a reasonable doubt. This group of cases thus involves those where

---

**9.** Violation of the right to presence creates a presumption of prejudice. *United States v. Taylor,* 562 F.2d 1345, 1365 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977). Petitioner Spain suggests that this presumption compels automatic reversal of any conviction obtained under circumstances where the right was violated. Petitioner's Memorandum in Support of Petition for Writ of Habeas Corpus, 17:12–17. Spain fails to note, however, that the cases cited in support of this contention—*Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892) and *Hopt v. People,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884)—involved the absence of the defendant from the initial jury selection process. Where, as here, the right to be present was violated by a mid-trial communication between judge and juror, the test applied is not automatic reversal, but harmless error. *United*

States v. Taylor, supra, 562 F.2d at 1365; see also *United States v. Walls, supra,* 577 F.2d at 698.

For a discussion of the application of the harmless error test to the facts of this case, *see* this Opinion, *infra,* at pages 771–77.

**10.** Unlike state court factual determinations, state court findings of law are not entitled to deference in a federal court considering a petition for writ of habeas corpus. *Sumner v. Mata, supra,* 102 S.Ct. at 1306–07; *Townsend v. Sain,* 372 U.S. 293, 318, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963). Thus the decision by the California Court of Appeal that the harmless error test applies to the right to counsel violation here in no way binds this Court, which is obligated to apply the controlling federal law to the facts before it.

"the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury." [*Holloway v. Arkansas*, 435 U.S. 475] at 490, 98 S.Ct. [1173] at 1182 [55 L.Ed.2d 426 (1978)].
*Cooper v. Fitzharris, supra*, 586 F.2d at 1332.

By contrast, in cases requiring automatic reversal, the trial court record is such that a reviewing court seeking to discern the harmlessness of the right to counsel violation would be forced to engage in "unguided speculation." *Id.*

When no counsel is provided or counsel is prevented from discharging his normal functions, the evil lies in what the attorney does not do, and is either not readily apparent on the record, or occurs at a time when no record is made.

*Id.; accord, Slappy v. Morris, supra*, 649 F.2d at 723. Under such circumstances, the harmless error standard, which is predicated on review of a record that reflects that the defendant was prejudiced in some specific fashion, is not "susceptible to intelligent, evenhanded application." *Cooper v. Fitzharris, supra*, 586 F.2d at 1332, *quoting Holloway v. Arkansas*, 435 U.S. at 490, 98 S.Ct. at 1181. A reviewing court confronted with a deprivation of the constitutional right to counsel must reverse where the state of the record precludes intelligent, evenhanded application of the standard of review that would otherwise control.[11]

**11.** A federal district court reviewing a state conviction in the context of a petition for writ of habeas corpus is authorized to expand the trial court record if necessary to determine the appropriateness of issuance of the writ. *Harris v. Nelson*, 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969); Rule 7, Rules Governing Section 2254 Cases, 28 U.S.C. foll. § 2254. As discussed, *infra*, at pages 773–76 of this Opinion, however, this Court's ability to expand the state court record is severely limited by the factual circumstances of the case before it.

**12.** As noted above, the Supreme Court has granted certiorari in *Slappy v. Morris*, —— U.S. ——, 102 S.Ct. 1748, 72 L.Ed.2d 160 (1982).

A comparison of the facts in *Cooper v. Fitzharris, supra*, and *Slappy v. Morris, supra*,[12] is instructive for comprehending the distinction between these two groups of cases and for assessing the instant case in terms of that distinction.

In *Cooper*, the petitioner alleged ineffective assistance of counsel resulting from errors and omissions committed by his attorney at trial. Alleged as the trial lawyer's defaults were the failure to object to the admission into evidence of fruits of a warrantless search, the failure to move to suppress statements made by the petitioner to the police, the failure to object to testimony concerning the identification of the petitioner at a pre-indictment lineup, and the failure to inform the petitioner of his right to appeal. 586 F.2d at 1328. Distinguishing Cooper's case from those in which reversal was automatic once deprivation of the right to counsel was shown, the Ninth Circuit observed that

[i]n this case, appellant does not assert that he was denied counsel at trial, or that counsel, though present, was prevented from performing a critical function or otherwise impeded in the advocacy of appellant's cause. Rather, appellant contends that although he had an attorney present and acting freely on his behalf, he did not have effective assistance of counsel because his attorney erred in specific respects in the course of trial. . . . [T]hese omissions were not forced on defense counsel. Their impact appears on the face of the trial record.

The nature of the constitutional violation at issue in *Slappy* is markedly different from the violation at issue here. *Slappy* concerns the circumstances under which failure of appointed counsel to appear at trial will be treated as a deprivation of the constitutional right to counsel even though the defendant was represented by substitute counsel. With respect to the *ex parte* communications between the judge and juror in Petitioner Spain's case, no counsel appeared, either substitute or otherwise. Thus the *Slappy* case is used here only to illustrate the principles dictating automatic reversal of a conviction and is not relied upon to establish the existence of a constitutional violation.

Their prejudicial effect can be evaluated from that record with reasonable certainty. In such a case there is no reason to reverse a conviction if it appears that the defense was not prejudiced by the alleged inadequacies of counsel's performance.

*Id.* at 1332. By applying these principles, the court was able to ascertain with "reasonable certainty" that the specific errors allegedly committed by trial counsel either were not errors under the state of the law as it existed at the time of trial or were not prejudicial. *See id.* at 1333–34.

In *Slappy*, the Ninth Circuit found that the petitioner was denied his right to counsel when the trial judge, without making any inquiry as to when the public defender originally appointed to represent the defendant might be available, refused to grant a continuance of the trial to enable that lawyer to be present. 649 F.2d at 721–22. By arbitrarily depriving the petitioner of his right to a "meaningful attorney-client relationship," the trial court infringed on Slappy's Sixth Amendment right to counsel. Given the nature of the constitutional violation, the competency of the public defender appointed as substitute counsel was irrelevant. *Id.* at 723. The injury inflicted on Slappy arose from interference with his relationship with his first lawyer, and because the impact of that harm on the defense could not be assessed by examining the trial record established by a second lawyer, automatic reversal was required.

■ When the facts of Petitioner Spain's right to counsel violation are viewed in light of the distinction thus drawn between cases scrutinized under the harmless error test and those subject to automatic reversal, it is clear that reversal is automatic here. The state of the record, viewed in light of the nature of the violation, precludes intelligent application of the harmless error standard. Counsel for Spain was barred from discharging the critical function of protecting Spain's right to trial by an impartial jury when the trial judge failed to inform him of the *ex parte* communications from Juror Fagan. *See Cooper v. Fitzharris, supra,* 586 F.2d at 1332. Spain's counsel was not only prohibited from determining Ms. Fagan's continuing fitness to serve on the jury, but also was prevented from making efforts to minimize the impact on other jurors of Ms. Fagan's information and emotional state. *See Gibson v. Clanon,* 633 F.2d 851, 854 (9th Cir. 1980), *cert. denied,* 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981); *see also* Section III., A., 1. of this Opinion, *supra.* No record was made of the conversations between judge and juror at the time they occurred, and the private nature of those discussions prevented the resultant interference with the normal functions of Spain's lawyer from being "readily apparent on the record." *Cooper v. Fitzharris, supra,* 586 F.2d at 1332; *Slappy v. Morris, supra,* 649 F.2d at 723. Reversal of Spain's conviction is thus compelled because there is no record that permits this Court to undertake with confidence an assessment of the "likelihood that the error materially affected the deliberations of the jury." *Holloway v. Arkansas,* 435 U.S. 475, 490, 98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978).

What is known from the record of the trial is that Ms. Fagan had at her disposal information, not introduced as evidence, connecting a leader of the Black Panther Party to the violent death of her friend; that the murder of her friend was an extremely emotional issue for Ms. Fagan; and that other jurors were told by Juror Fagan of the murder of her friend by a Black Panther Party leader. The inability of Spain's lawyer to establish a record with respect both to Ms. Fagan's possible bias and to efforts to limit the contamination of other jurors prevents this Court from engaging in anything but "unguided speculation" as to the impact of these matters on the jury's deliberations. *Cooper v. Fitzharris, supra,* 586 F.2d at 1332. The violation of Spain's right to counsel under these circumstances therefore compels reversal of the conviction and issuance of the writ

without further inquiry into the harmlessness *vel non* of the constitutional error.[13]

The Respondents point to the post-trial hearing on Spain's motion for a new trial, contending that the record adduced there concerning the *ex parte* communications between judge and juror permits this Court to make the assessment required under the harmless error test and thus obviates the need to automatically reverse Spain's conviction. The defect in this contention is apparent from the fact that reversal would be required even if the harmless error standard, rather than automatic reversal, were applicable to the right to counsel violation in this case. We therefore turn to application of the harmless error test to demonstrate the weakness of Respondents' contention, thereby also illustrating the analysis by which this case would be decided if the deprivation of Spain's right to be present were the only constitutional error at issue here. *See* Section III., A., 2. of this Opinion, *supra,* at 759, n.9.

As a threshold matter, we note that the California trial court, in denying Petitioner Spain's motion for a new trial, implicitly if not explicitly found the constitutional errors at issue here to be harmless. C.T. 24013:12–24014:7. The California Court of Appeal expressly reached the same conclusion. Ct.App. Opinion at 14–17. As pointed out above, a state court's findings of fact are entitled to a presumption of correctness in a federal habeas corpus proceeding. 28

U.S.C. § 2554(d); *see Hines v. Enomoto,* 658 F.2d 667, 675 (9th Cir. 1981). A state court's application of the legal standard to those facts, however, is not entitled to deference. *See Sumner v. Mata, supra,* 102 S.Ct. at 1306–07; *see also Imbler v. State of California,* 424 F.2d 631, 632 (9th Cir.) (per curiam), *cert. denied,* 400 U.S. 865,. 91 S.Ct. 100, 27 L.Ed.2d 104 (1970). Application of the constitutional harmless error test to the facts thus presents a federal question that this Court must resolve independently. *Chapman v. State of California,* 386 U.S. 18, 20–21, 87 S.Ct. 824, 826, 17 L.Ed.2d 705 (1967).

 Our task under the harmless error test is to determine whether there is a reasonable possibility that the error materially affected the verdict. *Hinman v. McCarthy,* 676 F.2d 343, 349–50 (9th Cir. 1982). If so, a reversal of the conviction is mandated. *Id.* Alternatively stated, a writ must issue unless the Respondents prove beyond a reasonable doubt that the constitutional error that occurred here did not contribute to the verdict obtained. *Chapman v. State of California, supra,* 386 U.S. at 24, 87 S.Ct. at 828.

Rather than focus on the right to be present or the right to counsel violations in arguing that what occurred at Spain's trial was harmless beyond a reasonable doubt, the Respondents stress the right to be tried by an impartial jury that underlies each of these violations. This focus is reflected in

**13.** Respondents cite two cases in which the absence of counsel during judge-jury communications was tested under the harmless error standard, *United States v. Cassasa,* 588 F.2d 282, 285 (9th Cir. 1978), *cert. denied,* 441 U.S. 909, 99 S.Ct. 2003, 60 L.Ed.2d 379 (1979) and *United States v. Reynolds,* 489 F.2d 4, 7–8 (6th Cir. 1973), *cert. denied,* 416 U.S. 988, 94 S.Ct. 2395, 40 L.Ed.2d 766 (1974), on which the *Cassasa* court relied. Both of these cases involved communications between the judge and jury during final jury deliberations rather than in the midst of trial, and both are distinguishable from this case for two further reasons. First and most important is that in both cases a record existed of all of the communications and the circumstances under which they occurred. This is in stark contrast to the instant case in which, though the record may permit us to reconstruct the content and context of Ms. Fa-

gan's conversations with Judge Broderick, there is nothing from which to discern exactly what other jurors were told and the circumstances under which they obtained information from Ms. Fagan. Thus, unlike *Cassasa* and *Reynolds,* the record here does not enable this Court to determine whether the constitutional error was harmless. Second, neither case posed a question of a violation of the defendant's constitutional right to counsel. Both cases were decided under Fed.R.Crim.P. 43(a), a Rule not implicated here because Petitioner Spain was tried in state, not federal, court. With respect to this distinction, we note that Rule 43(a), violation of which triggers the harmless error standard adopted in Fed.R. Crim.P. 52(a), concerns the absence of a *defendant* at every trial stage, and makes no reference to the right of a federal criminal defendant to have *counsel* present.

the two basic premises of the Respondents' harmless error argument: that the matters communicated during Ms. Fagan's conversations with the trial judge did not relate to a fact in controversy at the trial, and that any inference of juror bias that could be drawn from the fact of the *ex parte* communications was rebutted at the post-trial hearing.

With respect to the content of the conversations between Judge Broderick and Juror Fagan, the Respondents emphasize what they perceive as the reasons that *ex parte* communications between judge and juror are prohibited. As Respondents see it, the prohibition is a function of the danger that a juror may receive incorrect information about the facts or law of the case, or that a juror may be influenced by the court's attitude as conveyed through such communications. Because the conversations between Ms. Fagan and Judge Broderick did not present either of these dangers, the Respondents argue that Petitioner Spain was not prejudiced by them. Not only was the subject matter of the discussions—the death of someone at the hands of an individual who was neither a party nor a witness at Spain's trial—unrelated to any fact in controversy, but the trial court did not communicate facts or legal principles to Ms. Fagan, nor attempt in any way to influence her. Thus, in Respondent's view, the content of the conversations did not harm the Petitioner because none of the dangers sought to be prevented by the prohibition of *ex parte* judge-juror communications was present.

Respondents nonetheless acknowledge that the defense may have been harmed by the fact that, at the time of the conversations, Spain's lawyer was unable to determine whether Ms. Fagan was biased by the information about her friend's death. At the hearing on Spain's motion for a new trial, however, Ms. Fagan testified that she was not biased against Petitioner Spain, and, on the basis of her testimony, the trial court as well as the California Court of Appeal found Ms. Fagan to have been a fair and impartial juror. The Respondents point to the record of the post-trial hearing as enabling this Court to make the requisite determination under the harmless error standard and as showing that, in fact, the error that occurred was harmless beyond a reasonable doubt. As to the other jurors, Respondents contend first that, as with the conversations between Ms. Fagan and the judge, the content of the information conveyed to them by Ms. Fagan was completely unrelated to matters that the jury was called upon to decide, and thus there is no reason to doubt their impartiality. Furthermore, Respondents argue that Petitioner Spain's failure to call the other jurors to testify at the post-trial hearing constitutes a waiver of any challenge to the conviction based on juror contamination.

By focusing on the juror partiality implications of Ms. Fagan's conversations with the trial judge, Respondents ignore significant interests sought to be protected by the right to presence and the right to counsel, interests that cannot be adequately safeguarded by a post-trial hearing. The weaknesses in the Respondents' argument are examined below.

Respondents contend that because Judge Broderick neither communicated information to Ms. Fagan nor attempted to influence her, Petitioner Spain could not have been harmed by the substance of what was said during the *ex parte* conversations. By concentrating on what was said *to* Ms. Fagan, the Respondents overlook that Juror Fagan was telling the trial judge that she had information that was not introduced as evidence at trial. This fact apparently escaped the attention of the trial judge, but nothing in the trial record permits us to determine whether it would also have gone unnoticed by Petitioner Spain and/or his lawyer if they either had been present at, or notified of the occurrence and content of, the conversations between Ms. Fagan and Judge Broderick. Spain was thus deprived of the opportunity to explore what Ms. Fagan knew, how she came to know it, the effect of her knowledge on her state of mind with respect to affording the Petitioner a fair hearing, and ways of preventing the information from coming to the attention of other jurors.

Possibly recognizing this weakness in their argument, the Respondents stress that Petitioner Spain could not have been harmed by what was revealed during the conversations between the juror and the judge because the subject matter under discussion was unrelated to anything in controversy at trial. Though it is true that Carolyn Olson's death and Elmer Pratt's role in it were not directly at issue in Petitioner Spain's trial, it does not follow, as Respondents contend, that the subject under discussion between Ms. Fagan and Judge Broderick was "totally irrelevant" to the trial. Respondents' Memorandum of Points and Authorities, 21:5–8. Respondents take far too narrow a view of the trial.

As the pre-trial jury voir dire reveals, Spain's counsel was concerned from the outset that those who sat in judgment on his client not have personal experience with violence or associate the Black Panther Party with violence. The trial court acknowledged the validity of this concern when it permitted pre-trial voir dire on these subjects. *See* this Opinion, *supra*, at page 761. Its legitimacy is reflected in the violent nature of the crimes charged, the defense testimony about Spain's Black Panther Party membership, and the prosecutor's suggestion in closing argument that Spain's criminal liability should be inferred from his association with the Black Panther Party. When Ms. Fagan talked to the judge about Carolyn Olson's death, she revealed that, her voir dire testimony notwithstanding, *compare Smith v. Phillips, supra*, 102 S.Ct. at 943–44 n.4, she had personal knowledge of violent crime. Carolyn Olson was a good friend who had been brutally murdered. That Ms. Fagan had personal experience with violent crime, however, was not the only information that came to light during the juror's conversations with the trial judge. Petitioner Spain and his defense counsel might well have been even more concerned, had they known, that Ms. Fagan believed that her good friend had been killed by a leader of the Black Panther Party.

Respondents discount this information about the identity and political affiliation of Carolyn Olson's killer with the observation that Pratt was neither a witness nor a party at trial. This statement, though true, misses the point. From Petitioner Spain's perspective, the combination of Ms. Fagan's knowledge, its emotional impact on her, and the trial testimony concerning Elmer Pratt's leadership role in the Black Panther Party had potentially devastating implications. In a case concerning a violent series of events in which the Black Panther Party played a key role, *see* Ct.App. Opinion at 3–6, the defendant, though he did not know it, was being judged by a juror greatly distressed by memories of the violent death of her good friend at the hands of a person she knew to be a Black Panther Party member—a person shown by trial testimony to be a leader of that party. Extraordinary insight is not required to perceive the potential harm to Petitioner Spain if Ms. Fagan's personal experience, rather than the evidence at trial, were permitted to determine jurors' assessments of the defendant's guilt or innocence. If Spain or his lawyer had been made aware of the content of the communications between Juror Fagan and the trial judge, they would have had an opportunity to explore and attempt to limit this potential harm.

Apparently conceding that Ms. Fagan's revelations posed some danger to Petitioner Spain, Respondents acknowledge that the better course of action would have been to conduct a mid-trial voir dire of Ms. Fagan to explore the potential for bias reflected by her conversations with Judge Broderick. Respondents' Memorandum of Points and Authorities, 16:29–17:2. According to the Respondents, however, failure to follow the concededly preferable course was harmless because Ms. Fagan testified post-trial that she was not biased by the information she possessed or its effect upon her.

█ Respondents correctly observe that a juror is permitted to testify at a post-trial hearing convened to determine whether juror partiality played an impermissible role in the outcome of a trial. *See Smith v. Phil-*

*lips, supra*, 102 S.Ct. at 944–46, and *People v. Elkins*, 123 Cal.App.3d 632, 637, 176 Cal. Rptr. 729, 732 (1981); *People v. Hall*, 108 Cal.App.3d 373, 380, 166 Cal.Rptr. 578, 582–83 (1980). At the same time, the Respondents necessarily concede that a juror may not testify post-trial about the mental process by which s/he arrived at a verdict. *Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892); Fed.R. Evid. 606(b); *People v. Hall, supra*, 108 Cal.App.3d at 378–80; Cal.Evid.Code § 1150(a). When Ms. Fagan's post-trial testimony is examined in light of this rule restricting juror impeachment of a verdict, it is clear that, even relying on the post-trial record, the Respondents cannot prove beyond a reasonable doubt that the constitutional errors that occurred in this case did not contribute to the verdict.

The rule, broadly stated, that a juror is incompetent to testify to impeach his/her verdict, *McCormick's Handbook on the Law of Evidence* 148 (2d ed. E. Cleary 1972), developed to protect the finality of the verdict and the sanctity of the deliberative process resulting in that verdict. *See Mattox v. United States, supra*, 146 U.S. at 148, 13 S.Ct. at 52. A distinction reflecting a balance of these concerns and the interests of justice has been drawn between what may and what may not be established by juror testimony in connection with challenges to verdicts. That distinction, articulated in *Mattox*,[14] is embodied in modern evidentiary rules. Rule 606(b) of the Federal Rules of Evidence provides that

> Upon inquiry into the validity of a verdict . . . , a juror may not testify as to any

matter or statement occurring during the course of the jury's deliberations or the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict . . . or concerning his mental processes in connection therewith, except that a juror may testify on the question whether prejudicial information was improperly brought to the jury's attention or whether outside influence was improperly brought to bear upon any juror.

*See United States v. Moten*, 582 F.2d 654, 664–65 (2d Cir. 1978). California Evidence Code Section 1150(a) similarly distinguishes between independently ascertainable events and the deliberative process of the jury in determining the admissibility of evidence offered to test the validity of a verdict.[15]

▮ The fact and content of Ms. Fagan's conversations with Judge Broderick clearly fall into the category of matters to which a juror may testify during hearings challenging a verdict. Though the trial court and the California Court of Appeal stressed that the information Ms. Fagan possessed was at best only marginally relevant to the trial, *see* C.T. 24013:12–17, 24014:1–7; Ct.App. Opinion at 13–14 and 18–19, the potential prejudice to Petitioner Spain did not arise from Elmer Pratt's connection to the 1971 events at San Quentin but from Ms. Fagan's knowledge of and reaction to matters not in evidence at trial. *See* discussion, *supra*, at page 773 of this Opinion. The danger that the verdict might have been improperly influenced by what Ms. Fagan knew, how it affected her, and what the other jurors knew about

---

14. The Supreme Court in *Mattox* drew the distinction between admissible and inadmissible juror testimony as follows:

> [T]he evidence of jurors as to the motives and influences which affected their deliberations, is inadmissible either to impeach or to support the verdict. But a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind.

*Id.* at 149, 13 S.Ct. at 53. *Compare* Fed.R.Evid. 606(b); *see also* Cal.Evid. Code § 1150(a).

15. California Evidence Code § 1150(a) states:

> Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental process by which it was determined.

*See People v. Hall, supra*, 108 Cal.App.3d at 378–380.

the death of Ms. Fagan's friend certainly brings these matters within the scope of those that may be the subject of post-trial juror testimony in either California state or federal court.

In neither state nor federal court, however, could Ms. Fagan or any other juror testify about how or whether the circumstances of Carolyn Olson's death influenced the decision to assent to the verdict. Cal.Evid.Code § 1150(a); Fed.R.Evid. 606(b). See also Ct.App. Opinion at 17 (some of Ms. Fagan's testimony at the motion for a new trial insofar as it relates to her mental attitude in arriving at the verdicts may well have been inadmissible). Once it is determined that prejudicial information was improperly brought to the jury's attention, the reviewing court must decide whether the impropriety was harmless in its effects on the jury's deliberations. That decision must be made without refer-

ence to testimony from jurors about what influenced their verdict.

The Respondents' observation that a juror may testify at a post-trial hearing concerning juror partiality is accurate but inapposite. Matters within a juror's personal experience that relate to issues generally raised by all criminal trials are far different from specific information implicating the merits of a particular case but not introduced in evidence. Thus, that a juror may testify at a post-trial hearing at which a court seeks to determine whether juror partiality played an impermissible role in the outcome of a trial, Smith v. Phillips, supra, 102 S.Ct. at 944–46, does not mean that a juror may testify as to whether prejudicial information concerning the merits of a case and improperly brought to the attention of the jury influenced the outcome of the jury's deliberations.[16]

This limitation on matters to which a juror may testify post-trial completely un-

16. Smith v. Phillips, supra, 102 S.Ct. 940 (1982) provides a useful contrast to the instant case. In Smith, a criminal defendant contended that he had been denied Due Process because, during his state court trial, one of the jurors in his case applied to the prosecutor's office for a job as an investigator. Though the juror's interest in a federal law enforcement career was revealed and thoroughly examined by defense counsel during initial voir dire, id. at 943–44 n.4, the fact of the application was not brought to the trial court's attention until sometime after the verdict was rendered. The trial court held a post-trial hearing on a motion to set aside the verdict at which the errant juror testified. The trial judge denied the motion to set aside the verdict, finding that the juror's action did not reflect an inability to consider the guilt or innocence of the defendant solely on the evidence. The federal district court issued a writ of habeas corpus, imputing juror bias from the circumstances, though unable to find sufficient evidence of actual bias on the juror's part.

Rejecting the use of implied juror bias as grounds for requiring a new trial, the Supreme Court reversed. The Court observed that neither the federal district nor the federal circuit court took issue with the trial court's findings, and stated that

Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen... [A] hearing such as that conducted [by the trial court] here is suffi-

cient to decide allegations of juror partiality...

102 S.Ct. at 946.

The contrast to Petitioner Spain's case is striking. As pointed out in the text, the matter to be resolved at the post-trial hearing was quite different in Smith from that in the instant case. The only issue in Smith was that of juror partiality based on juror conduct unrelated to the merits of the case against the defendant. Furthermore, the sequence of events in Smith gave rise to a very different constitutional claim from those involved here. In Smith, as soon as the information about possible juror bias came to light, a hearing was conducted with the defendant and his counsel present and participating. The only issue at that hearing was juror partiality and its Due Process implications, and the nature of the initial voir dire concerning the juror's interest in a law enforcement career made the juror's post-trial testimony virtually cumulative. There was thus no ex parte communication in Smith on which a claim of deprivation of the right to presence or the right to counsel could be based, and no revelation of significant information concerning the merits of the case that was not disclosed at the initial voir dire. The harmlessness of the juror's conduct in Smith could be determined post-trial, and no harm independent of that conduct was alleged. In the case before this Court, the failure of the trial judge to conduct a mid-trial voir dire of Ms. Fagan gave rise to constitutional violations not subject to cure by a post-trial hearing.

dermines the Respondents' contention that Petitioner Spain waived any challenge he might have had based on juror contamination by failing to call other jurors to testify at the post-trial hearing. It is clear from the record of the post-trial hearing that Ms. Fagan communicated the fact of her friend's death at the hands of Elmer Pratt to other jurors. R.App. 5482:2–3; C.T. 23971:28—23972:1. These other jurors, if called, could not have testified whether or to what extent this information influenced their respective decisions to assent to the verdicts. Cal.Evid.Code § 1150(a); Fed.R. Evid. 606(b). Petitioner Spain raised the question of juror contamination both at the trial court and the state appellate court levels. C.T. 23985:11–15; Ct.App. Opinion at 11. In light of the restrictions on juror post-trial testimony, Petitioner Spain could have done nothing more to preserve his claim of juror contamination.

■ To the extent that the constitutional errors that occurred here implicate the Due Process right to be tried by a panel of twelve impartial jurors, this Court's consideration of that issue thus is limited by the restrictions imposed on juror testimony about the deliberative process. These restrictions require the application of an objective test to evaluate the effect that the prejudicial information brought to the jury's attention by Ms. Fagan had on the outcome of the trial. *See United States v. Armstrong,* 654 F.2d 1328, 1333 n.2 (9th Cir. 1981) and *Miller v. United States,* 403 F.2d 77, 83–84 n.11.[17] Under the objective test, this Court must assess for itself the likelihood that the information known and conveyed by Ms. Fagan would affect a typical juror. *Id.*

■ Were this a case involving a straightforward Due Process claim, determination of the harmlessness *vel non* of the error would be dictated by "the nature of what [was] infiltrated and the probability

17. Though these cases involved federal court trials at which jury contamination occurred, the objective test therein applied derives from the Federal Rules of Evidence which are also controlling in federal habeas corpus cases. *See*

of prejudice." *United States v. Love,* 535 F.2d 1152, 1156 (9th Cir.), *cert. denied,* 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 119 (1976). The nature of the information infiltrated and the possibility of prejudice that it posed have already been discussed at length and need not be reiterated. Considered alone they would be sufficient to raise a reasonable possibility that the error materially affected the verdict and thus to compel issuance of the writ sought here. *Hinman v. McCarthy, supra,* 676 F.2d at 349–50. Though the California Court of Appeal concluded that the fact that Petitioner Spain was acquitted on some counts shows that the jury was not biased, Ct.App. Opinion at 17–18, that very fact is subject to precisely the opposite inference. Spain was the only defendant who was a member of the Black Panther Party and the only defendant convicted of conspiracy and murder. The only counts on which Spain was convicted were those with which he was connected, not by any direct participation in the acts of violence at San Quentin, but by his association and alleged conspiracy with George Jackson, also a Black Panther. All of the other defendants were acquitted of the conspiracy counts and the related substantive crimes. This pattern of convictions and acquittals, viewed from the perspective of the dangers posed by Ms. Fagan's personal exposure and reaction to events linking the Black Panther Party to other violent crime, certainly raises a reasonable possibility that the information known by Ms. Fagan and communicated to other jurors influenced the verdicts.

This case, however, goes far beyond a straightforward Due Process claim based on extra-judicial influences on the jury. The nature and circumstances of these right to presence and right to counsel violations prevent this Court from concluding beyond a reasonable doubt that neither of the errors influenced the verdict rendered against Petitioner Spain. *Chapman v. State of California, supra,* 386 U.S. at 24, 87 S.Ct. at 828.

*Smith v. Cupp,* 457 F.2d 1098, 1100 (9th Cir.), *cert. denied,* 409 U.S. 880, 93 S.Ct. 208, 34 L.Ed.2d 135 (1972); *see also* Fed.R.Evid. 1101(a) and (e).

The Respondents contend that their burden under the harmless error test is met by the facts adduced at the post-trial hearing conducted in this case. Even putting aside the limitations on post-trial juror testimony already discussed, *supra,* at pages 773–776 of this Opinion, the function that was served by Spain and his counsel at the hearing on the motion for a new trial was far different from the one they would have performed at a mid-trial voir dire of Ms. Fagan. At the time the conversations occurred, Judge Broderick perceived no connection between what Ms. Fagan told him and the issues in the case being tried. C.T. 23920:11–17; Ct.App. Opinion at 11. Accordingly, the trial judge's questions to Ms. Fagan went no further than to inquire of the juror whether the testimony about her friend would affect her disposition toward the case. If Petitioner Spain and his counsel had been informed of the fact and general content of the communications between Ms. Fagan and the trial judge, they would have been able to question her in depth about the relationship between her personal experience and her attitude about the case on which she was sitting. It is not unreasonable to assume that such questions, posed at a time when the emotional state prompting Ms. Fagan's contacts with the judge was still evident, might have elicited from Ms. Fagan different responses from those given at the post-trial hearing.

Even if a mid-trial conference with Spain and his counsel participating had not resulted in removal of Ms. Fagan from the jury, the defense team would have had an opportunity to reassess the evidence they wished to present in light of what they learned about Ms. Fagan's exposure to the Black Panther Party. This opportunity, once lost, could not be regained by a post-trial hearing. Similarly, the chance to keep Ms. Fagan's information from reaching other jurors was a fleeting one not susceptible to recapture after the trial.

These irretrievable opportunities, if exercised by the Petitioner, certainly had the potential to influence the outcome of the trial. If mid-trial voir dire by Spain and his counsel had uncovered bias requiring re-placement of Ms. Fagan by an alternate juror untainted by personal exposure to Black Panther Party violence, it cannot be concluded beyond a reasonable doubt that the outcome of the trial with respect to Petitioner Spain would have been the same as it was with Juror Fagan sitting on the jury. If, despite a mid-trial voir dire, Ms. Fagan had remained on the jury, but, based on what was learned of Ms. Fagan's reaction to the death of her friend, the Petitioner and his counsel had decided not to introduce evidence stressing Spain's membership in the Black Panther Party, it cannot be said with confidence that the pattern of verdicts and acquittals would have been the same. It also cannot be concluded that the verdicts on the charges against Petitioner Spain would have been the same had other jurors not been informed that a Black Panther member had killed a good friend of one of their fellow jurors, a fellow juror with whom they were in almost constant contact for over a year. Thus, the post-trial record notwithstanding, a reasonable possibility certainly exists that the failure to provide for the presence of Spain, or at least his counsel, at a mid-trial voir dire of Ms. Fagan affected the outcome of the case against the Petitioner.

As the foregoing analysis reveals, the very circumstances that require automatic reversal in this case, *see* this Opinion, *supra,* at pages 770–71 would require reversal if harmless error were the applicable standard of review. The violation of Petitioner Spain's right to be present and right to counsel leave this Court with no choice but to issue the writ of habeas corpus sought by the Petitioner.

B. *Shackling of Petitioner Spain.*

Because the violation of Petitioner Spain's Sixth Amendment right compels issuance of the writ, we need not reach the constitutional issue raised by Spain's shackling claim. *See New York City Transit Authority v. Beazer,* 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979). Nor are we required to decide whether that claim, standing alone, mandates issuance of

the writ. We observe, however, that the shackling of Petitioner Spain in the extreme manner used in the trial court appears to violate the right to a fair trial that is a fundamental liberty secured by the Fourteenth Amendment. *Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975).

Shackling a defendant in the courtroom is widely recognized as prejudicial because it infringes on the accused's right to the presumption of innocence. *Kennedy v. Cardwell*, 487 F.2d 101 (6th Cir. 1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974); *United States v. Samuel*, 431 F.2d 610, 614–15 (4th Cir. 1970), *cert. denied*, 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971); *Loux v. United States*, 389 F.2d 911, 919 (9th Cir.), *cert. denied*, 393 U.S. 869, 89 S.Ct. 156, 21 L.Ed.2d 138 (1968).[18] *See also Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). The presumption of innocence, though not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice. *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976).

■■■ The right to the presumption of innocence at trial is not, however, an absolute right. Under certain circumstances, it must give way to the court's concern for the safety of other courtroom participants, *United States v. Samuel, supra*, 431 F.2d at 615, or to the need for an orderly trial, *see Kennedy v. Cardwell, supra*, 487 F.2d at 107. The question is whether, under the circumstances of the instant case, the physical restraints placed on Petitioner Spain were justified.

From the moment of his indictment, every state court appearance made by Spain was made under the security arrangements described in Part I. of this Opinion. *See* above at page 762. Based on Court Exhibits 17 and 18, as well as Judge Broderick's statements prior to sentencing, we must infer that the decision to shackle the

defendants throughout the trial was based on the nature of the offenses charged, the acts of the defendants during pre-trial and trial proceedings, and the security incident reports concerning the behavior of the defendants at San Quentin, compiled in Court Exhibit 17.

The seriousness of the offenses with which Petitioner Spain was charged should not be underestimated. The events leading to the indictment involved a violent escape attempt in which five people died. Those events, however, occurred almost four years before the trial commenced. In the interim, Petitioner Spain made numerous court appearances. Though disruption of pre-trial proceedings by the other defendants did occur, Petitioner Spain's participation in such misconduct appears to have been limited to one altercation resulting in his removal from the courtroom. C.T. 899, 900.

With respect to the trial itself, Court Exhibits 17 and 18 provide this Court with a unique opportunity to view both the scope of the security measures in use and the conduct of the Petitioner and his co-defendants. The security measures, including the physical restraints placed on the defendants, were visible to courtroom participants. *See* Court Exhibit 18 and C.T. 24005:2–9. The trial occupied 203 court days, not including twenty-four days of jury deliberations, and took place over a seventeen month period. During this period, Petitioner Spain engaged in the fourteen incidents of misconduct listed in Part I. of this Opinion at page 763. Only seven of those fourteen incidents occurred in the courtroom and only three occurred while the jury was present.

It is obviously impossible to discern whether and to what extent Petitioner Spain's misconduct was prompted by or contributed to by the physical restraints under which he was placed. Throughout the pre-trial and trial proceedings, however, Spain, as well as other defendants, repeatedly requested the opportunity to appear unshack-

---

18. Though several of these cases were decided under the supervisory power of the federal appellate courts in federal criminal cases, the principles relied upon are equally applicable in the constitutional context presented here.

led. In light of the other security measures in use at trial, the failure to provide such an opportunity is of grave concern. *See Illinois v. Allen, supra,* 397 U.S. at 346, 90 S.Ct. at 1062.

█ Because the shackling of criminal defendants is regarded as a last resort, *id.* at 344, 90 S.Ct. at 1061, the use of such a procedure is justified only where no less drastic alternative will suffice. *Kennedy v. Cardwell, supra,* 487 F.2d at 111; *United States v. Esquer,* 459 F.2d 431, 433 (7th Cir. 1972), *cert. denied,* 414 U.S. 1006, 94 S.Ct. 366, 38 L.Ed.2d 243 (1973); *United States ex rel. Boothe v. Superintendent,* 506 F.Supp. 1337, 1341 (E.D.N.Y.), *rev'd on other grounds,* 656 F.2d 27 (2d Cir. 1981).

This case involves the uninterrupted use of maximum physical restraints on a defendant whose disruptive conduct can best be characterized as minor. When viewed in light of the other security precautions in place throughout the trial, the failure to use a less drastic alternative means of restraint might well mandate reversal were this Court required to resolve the shackling issue.

### III. CONCLUSION

Only with the greatest reluctance will this Court or any other federal court intrude upon a state criminal proceeding. *See Engle v. Isaac, supra,* 102 S.Ct. at 1570–72. However, the protection and vindication of federal constitutional rights requires that considerations of comity give way to the writ that stands as "a bulwark against convictions that violate 'fundamental fairness'." *Id.* at 1570. Petitioner Spain's conviction, obtained in violation of his Sixth Amendment rights to presence and counsel, violates fundamental fairness.

The petition for writ of habeas corpus is granted. California shall commence retrial of the petitioner within ninety (90) days or he shall be released from custody with respect to the conviction at issue. The Court is aware that the Petitioner may face continued incarceration stemming from another conviction.

SO ORDERED.